THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ESTABAN TORRES, a/k/a Estaban Torres-Anselmo, Defendant-Appellant.

Second District   No. 2—93—1187

Opinion filed January 19, 1995.

340

Timothy K. Mahoney and Donald M. Tegeler, Jr., both of McNamee, Mahoney & Nave, Ltd., of Dundee, for appellant.

David R. Akemann, State's Attorney, of St. Charles (Thomas J. Stanfa, Assistant State's Attorney, and William L. Browers and Lawrence M. Bauer, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE COLWELL delivered the opinion of the court:

Defendant, Estaban Torres, a/k/a Estaban Torres-Anselmo (Torres), appeals his convictions following a bench trial on charges of second-degree murder (Ill. Rev. Stat. 1991, ch. 38, par. 9—2 (now 720 ILCS 5/9—2 (West 1992))) and aggravated discharge of a firearm (Ill. Rev. Stat. 1991, ch. 38, par. 24—1.2 (now codified, as amended, at 720 ILCS 5/24—1.2 (West 1992))). Torres contends the trial court erred in (1) finding him guilty beyond a reasonable doubt of second-degree murder, (2) refusing to apply the self-defense or defense of a dwelling affirmative defenses to both charges, (3) considering the cause or threat of serious harm as an aggravating factor during sentencing, and (4) considering a potential deterrent effect in determining the sentence. He also contends (5) that the firearm charges are inconsistent with the second-degree murder charge, (6) that the trial court denied him his right to allocution prior to sentencing, and (7) that the sentence imposed was excessive. We affirm.

Testimony at trial adduced the following facts. Late in the afternoon of April 14, 1992, a group of teenagers were congregated on the corner of Franklin and College Streets in Elgin, near Elgin Academy. The group included Alicia McGrail, Carla Gutierrez, Alejandro Mendez (a/k/a Gringo), and Amaury Velez (Maury). Alicia testified that she was the defendant's girlfriend at the time of the incident. She further testified that on the day of the incident, Maury was flirting with her and attempting to kiss and fondle her as they "hung out" on the corner. According to several trial witnesses, the defendant drove past the assembled group at approximately 5 p.m. on the way to his home at 362 Franklin, about a block away. After parking his vehicle, the defendant rode a bicycle back to the corner and confronted Maury regarding his behavior with Alicia and Torres' belief that Maury was the source of "threatening" letters he allegedly received. After some posturing and name calling, Maury allegedly told the defendant, "I don't want no trouble with you" and attempted to shake the defendant's hand. One account said Torres brushed off the gesture, jumped on his bike, and rode back to his house. Torres told police he shook Maury's hand before leaving and

felt the situation was resolved. Shortly thereafter, the gathering on the corner broke up, and Alicia and Carla walked to Alicia's house about a half block away on College Street.

Approximately 20 minutes later, Velez, Mendez and at least two other youths, Victor Perez (a/k/a Coque) and Edwin Crespo, came to Alicia's house brandishing sticks, pipes and baseball bats, some apparently inscribed with gang insignia and embedded with nails. Alicia testified that they made reference to being on their way to Torres' house to "get him." Shortly thereafter, while Crespo waited at the corner, Mendez, Velez, Perez and possibly several other youths headed up the street and reassembled in front of Torres' residence, where they fanned out around the building and began smashing windows and yelling. One of the men also smashed the windows on a truck parked in the driveway and a car alarm began shrieking.

Inside the house were Torres, his brothers Epifanio, Hector and Isabel Carachure, his cousin Lorenzo De Los Santos (a/k/a Lorenzo Soto), his sister-in-law Nercedalia Carachure, his mother Maria Concepcion Anselmo and two small children, and possibly one or two other relatives or friends of the family. There were two other small children from the household playing in the backyard at the time of the incident. Testimony indicated that one of the women was injured by flying glass while attempting to shield two of the children during the attack on the house.

Torres, Soto, and Epifanio Carachure exited the house through a side door and ran around to the front porch as the attackers retreated up the street. Evidence showed that Soto fired a .22 caliber shotgun or rifle. Epifanio admitted he fired a .380 handgun "in the air." Torres admitted he also shot a .380 handgun "in the air" and told police that he was shooting variously in the direction of the youths and "over their heads." Melody Van Wambeke, Veronica Currey and Sabrina Currey, who saw the incident from a house across the street, testified that Torres fired several shots with his feet planted and his arms extended parallel to the ground. Several of the youths admitted to being involved in the attack on the defendant's house and testified they felt bullets whiz past their heads as they ran from the scene.

During the shooting, Hector Carachure was inside the house placing a phone call to the police. That call and several calls from neighborhood residents reporting shots fired were received by the police dispatch center and relayed to officers at approximately 6:18 p.m. Several officers responded and began investigating the damage to the residence and interviewing the family members. One officer, Daniel Radmer, asked if he could look inside the home. After receiving permission, he apparently looked for evidence that a gun had been

fired into the house but, finding none, he went back outside and rejoined other officers still questioning family members in the driveway and side yard.

According to varying accounts, sometime between 6:18 and 6:30 p.m., the police received a call that someone had been shot at Elgin Academy. Several officers responded to the Academy's Sears Hall, where they were directed upstairs to the second-floor cafeteria. There they found Earl Harris, a custodian, lying dead from a bullet wound to his head. Officer Michael Whitty traced the approximate trajectory of the bullet, and found small holes in the glass and screen of a window facing in the direction of 362 Franklin. He then notified the officers at the defendant's home of a probable connection between Harris' death and the shots fired at 362 Franklin. Surveyors were called, and they pinpointed the source trajectory as being within a small area immediately adjacent to the front porch at 362 Franklin, where witnesses had reported Torres stood as he fired after the fleeing attackers. It should be noted that, although the cafeteria is considered to be on the second floor of Sears Hall, it sits at ground level on the side facing 362 Franklin due to the slope of the hillside into which Sears Hall is built.

The sequence of the following events is unclear from the trial record, but all happened between the initial call at 6:18 and the execution of a search warrant at approximately 10 p.m. At least a dozen officers were now working the investigation at 362 Franklin. The record shows that some officers were inside the house talking to the defendant's mother and sister-in-law, and several were in the driveway talking with Isabel Carachure, whom officers believed to be the owner of the residence. The officers talking to Isabel asked if there were any guns in the house. Isabel said yes and motioned for the officers to follow him. Two officers, Brian Gorcowski and Thomas Quigley, followed Isabel into the house through the side door. Isabel led them to a freezer in the dining room and moved aside some papers, revealing a handgun. One of the officers immediately grabbed Isabel's hands and led him back outside, while the other officer retrieved the gun, unloaded it, and turned it over to an evidence technician. The officers testified that they then asked Isabel for permission to search the house and he assented.

Another officer, Tracy Kaminski, entered the house and turned toward the back, where two bedrooms are located. Kaminski saw the defendant duck into the first bedroom. The officer followed and caught the door just as the defendant tried to close it. Kaminski testified he asked if he could search the room, and the defendant assented. The defendant then left the room as the officer entered. Kaminski found

a .380 caliber handgun and a box of .22 caliber ammunition under some clothes on a bedside table.

At about the same time, Officer Whitty, who had just arrived at 362 Franklin from the murder scene at Elgin Academy, noticed a gray bucket on the front porch of the house. He stepped closer, looked in the bucket, and saw several shell casings inside. He retrieved the bucket and handed it over to an evidence technician.

Officer Whitty was then beckoned across the street by Melody Van Wambeke, who said she had witnessed the incident from a house almost directly across from 362 Franklin. The officer testified that Van Wambeke identified the defendant as having fired a handgun at the fleeing subjects as they ran in the direction of Elgin Academy. Whitty called across the street to another officer to arrest the defendant. Torres and all of the other adult males from 362 Franklin (except Hector, who uses a wheelchair) were taken into custody and placed in squad cars. The defendant was subsequently charged with first-degree murder and two counts of aggravated discharge of a firearm.

At some point several police supervisors arrived. After some discussion, the search of the residence was halted pending application for a search warrant. A judge signed a warrant at 9:48 p.m., and the warrant was served by Detective James R. Barnes at 10:04 p.m. Barnes supervised an organized search of the residence which turned up at least one other weapon, as well as a loaded gun clip which did not fit any of the seized weapons, and numerous other items such as ammunition. It should be noted that no search was conducted of any of the vehicles parked in the driveway at 362 Franklin, nor was the garage searched.

Several days after the shooting, police were again called to Elgin Academy by maintenance supervisor Donald Koerner, who discovered another bullet embedded in a wooden jungle gym on the playground. Further investigation turned up several more bullets in the wood framing of the cafeteria windows.

Defense counsel motioned *in limine* to suppress the evidence found at the defendant's house, arguing that the police did not have proper permission or probable cause to initiate a search of the house and that the subsequent search warrant was improperly based on the fruits of the unlawful prewarrant search. The motion was denied by the trial court, and that ruling is not raised on appeal.

At trial, each of the officers and witnesses testified to the events. Following this exposition, Jack Welty, a forensic examiner employed by the Illinois State Police, testified that three of the bullets found at the school came from the same weapon that fired the fatal bullet,

and he could not make a determination as to the fourth because police had recovered only the inner core of the bullet, not the outer portion which would bear the unique markings of the gun that fired it. He further testified that the casings found in the bucket on the defendant's porch also came from one weapon, but he was not sure whether that was the same weapon which fired the bullets found at the school. He also said that the bullets from the weaponless clip found at the defendant's house were of the same sort as the spent bullets from the school and the victim that he examined and that the clip would fit either a 9mm Baretta or a .380 automatic Browning.

Michael Kreiser, also a forensic scientist employed by the Illinois State Police, testified that his study of the surveyors' documents and other physical evidence led him to the conclusion that the fatal bullet could only have been fired by someone standing within a narrow "window" of space immediately adjacent to the defendant's front porch. Prosecution eyewitnesses had previously testified that only Torres and Soto had been positioned anywhere within that "window" during the shooting. The defense offered the testimony of Tony Herring, who had lived in the upper apartment of the two-flat building where the defendant's family resided. Herring said that he looked out his window during the melee and saw one of the attackers running from the residence turn and possibly shoot at the house as Torres and Soto began firing. The trial court later made a finding based on evidence and admissions that Soto had fired a .22 shotgun and Torres fired a .380 automatic handgun. The court said that even if the attacker shot at Torres, there was no evidence that the attacker ever shot in the direction of the Academy. Pursuant to Welty's and Kreiser's testimonies, the court then found that only Torres could have fired the fatal bullet.

The defendant claimed that the weapon he fired was the one found by Officer Kaminski in his room. Prosecutors countered that the gun was found fully loaded and there was no opportunity for the defendant to have reloaded the weapon between the time of the shooting and when the officer found it. Consequently, prosecutors said, that gun could not have been the one the defendant fired. Rather, the prosecution opined, the "fatal" gun may have still been on the defendant's person when he brushed past the officer who searched his room, and he may have disposed of it outside during the commotion and milling about that went on after his room was searched, but prior to his arrest.

The defense argued that Torres' action in firing on the youths who broke his windows was justified under the "defense of a dwelling" and self-defense affirmative defenses. In rendering its judgment,

the trial court found this theory inapplicable, citing testimony that the alleged assailants were in fact fleeing at the time Torres fired at them. The court then addressed the first-degree murder charge and found that the defendant had the intent to kill when he fired at the youths and that such intent could be applied to Harris' death under the doctrine of transferred intent. The court then found that the statutory mitigating factors of intense passion and serious provocation existed due to the perceived attack on the defendant's home and family and therefore convicted Torres of second-degree murder. (720 ILCS 5/9—2 (West 1992).) The court also found that the State had met its burden of proof with regard to one of the two aggravated discharge of a firearm counts in showing that Torres had fired in the direction of another person. (720 ILCS 5/24—1.2(2) (West 1992).) The court determined that the evidence did not support a conviction on the other aggravated discharge of a firearm charge, regarding firing at a building known to be occupied. (720 ILCS 5/24—1.2(1) (West 1992).) Following a subsequent sentencing hearing, the court reviewed the statutory factors in mitigation and aggravation and then sentenced the defendant to 15-year terms on each of the counts and ordered that the sentences be served concurrently. We have jurisdiction pursuant to Supreme Court Rule 606. 134 Ill. 2d R. 606.

Our standard of review on a challenge to the sufficiency of the evidence in a criminal case is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*People v. Collins* (1985), 106 Ill. 2d 237, 261; *People v. Sutherland* (1992), 155 Ill. 2d 1, 17.) A reviewing court should apply this standard regardless of whether the evidence is direct or circumstantial and should not substitute its judgment for that of the finder of fact on questions involving the weight of the evidence or the credibility of the witnesses. *Sutherland*, 155 Ill. 2d at 17; *People v. Stremmel* (1994), 258 Ill. App. 3d 93, 107.

The defendant first contends that the prosecution failed to prove him guilty beyond a reasonable doubt of second-degree murder. In rendering its judgment, the trial court outlined its reasoning for the finding of guilt. The court commented on Kreiser's trajectory testimony regarding the "window" of possible origination points for the fatal shot and said:

> "I have looked at the possible people who were in that window. And looking at the testimony of the eyewitnesses and the defendant, I have concluded that there were two people from the residence at 362 Franklin that could be in that window: the defendant, Estaban, as well as his cousin, Lorenzo Soto.

Now *** I will note that [defense counsel] has presented evidence that also reflected that another person may have been in that window; in fact [one of] the aggressors who had attacked the defendant's house.

But in looking at that testimony, I don't believe that anyone else in that window *** was involved in shooting a gun towards the Elgin Academy. Therefore, the two people that I would have to look at would be the defendant and his cousin, Lorenzo Soto.

\* \* \*

Based on the testimony by the defendant, I believe that Lorenzo had a .22 caliber rifle that [is] in evidence and was recovered from the scene. I therefore discounted based on ballistics testimony and other testimony that the [fatal bullet] came from Lorenzo's gun.

Now, then I look to the defendant. *** The testimony shows that the defendant fired four shots, and that's by way of his admission. That is consistent with other witnesses and other testimony.

\* \* \*

Four projectiles were recovered in and around Elgin Academy, three of them had been identified as coming from a .380 semiautomatic [gun]. Four shell casings had been recovered at the scene from a .380 semiautomatic weapon.

One issue I have to deal with is *** the missing gun theory. That is, all the ballistics reports show that the guns that had been recovered from the defendant's home, including the two pistols and the .22 rifle, were not involved [in] shooting the projectiles or the four casings. The state's theory was that basically the defendant hid the remaining gun. ***

Now, I have to take into consideration several factors *** and most importantly [sic] is that a clip was recovered from the residence. The importance of that clip is that it did not belong to any of the three weapons that had been recovered. And that clip, in fact, the testimony showed it did fit and function in a .380 Baretta [sic], not in the defendant's pistol that was recovered from the room or the other guns. Now that's significant and that's important.

I also look at the fact that the defendant would have had the time to hide that particular weapon along with the fact that the four casings were hidden in a bucket by the porch. No other casings were found in the front yard where the shots were fired from.

Therefore, my conclusion is that the four shots fired by the defendant were shot at the fleeing antagonists and they were fired toward the Elgin Academy."

■ While this evidence is admittedly circumstantial, we cannot conclude that no reasonable trier of fact could have found that the defendant fired the shot that killed Harris. Rather, missing gun

notwithstanding, it appears that *only* Torres met all of the requisite criteria to have fired the fatal shot: he was within the "window" of trajectory, he fired a .380 caliber handgun, and he fired in the direction of the academy. No other person met all three of these critical factors according to witness testimony and other evidence adduced at trial.

The trial court further found that the defendant, by his own admission, shot in the direction of the fleeing assailants. The court found that by his actions, the defendant showed an intent to kill, and that such intent could be applied to Harris' resulting death. Consequently, the court found the requisite statutory elements of first-degree murder. (720 ILCS 5/9—1 (West 1992).) The court then found the mitigating factors of provocation and passion to apply and reduced the conviction to second-degree murder. (720 ILCS 5/9—2 (West 1992).) We conclude from the totality of the circumstances and viewing the evidence in the light most favorable to the prosecution that the trial court acted within the realm of a reasonable trier of fact in finding that the State had proved the defendant guilty beyond a reasonable doubt of second-degree murder.

■ We likewise conclude that the trial court did not err in refusing to apply the self-defense and defense of a dwelling affirmative defenses in the instant case. Whether a killing is justified under the law of self-defense is a question of fact to be determined by the trier of fact. (*People v. Turcios* (1992), 228 Ill. App. 3d 583, 594.) Numerous eyewitnesses testified that the assailants were fleeing when the defendant shot at them. The youths were no longer acting in a manner which could reasonably lead the defendant to believe that they were attempting to gain entry to his residence, nor that they were trying to harm him. Whether or not one of the youths had a gun and may have fired at the defendant after he appeared in the yard is immaterial; in exiting the building, running around to the front yard with a loaded gun and firing on youths who were already fleeing, Torres became an aggressor. The determination on the issue of self-defense by a trier of fact will not be disturbed on appeal unless the evidence is so unreasonable, improbable, or unsatisfactory as to leave a reasonable doubt of the defendant's guilt. (*Turcios*, 228 Ill. App. 3d at 595.) We conclude that the trial court's determination is neither unreasonable, improbable, nor unsatisfactory on the facts.

■ We next consider the defendant's contention that the offenses of second-degree murder and aggravated discharge of a firearm are legally inconsistent and thus may not both provide a basis for conviction. We find this argument without merit in the instant case. As the State correctly notes, we have previously held that verdicts are

legally inconsistent only where they necessarily involve a conclusion that the same essential element or elements of each offense are necessarily found both to exist and not to exist. (*People v. Munday* (1985), 134 Ill. App. 3d 971, 975.) There is no such conflict inherent in the two offenses charged in the instant case. Both offenses are specific intent crimes. Second-degree murder is merely first-degree murder mitigated by passion or provocation. This does not abrogate the need for intent to kill. (See 720 ILCS 5/9—2(1) (West 1992).) The aggravated discharge of a firearm charge at issue is premised on knowingly firing a weapon at another person. (720 ILCS 5/24—1.2(2) (West 1992).) By his own admission, the defendant fired at least four shots at the fleeing youths. One of those shots struck and killed Earl Harris, rendering the defendant guilty of second-degree murder. Any one of the other three shots fired at the fleeing youths could render the defendant guilty of aggravated discharge of a firearm. We find no inconsistency in these verdicts.

The defendant also argues that the trial court denied him his right to allocution prior to sentencing. (730 ILCS 5/5—4—1(a)(5), (a)(6) (West Supp. 1993).) This argument borders on the frivolous. Following the trial court's complete oral review of all of the potential factors in mitigation and aggravation, this exchange took place:

"THE COURT: So looking at the factors in aggravation, sentence necessary to deter others from committing this crime, the conduct [caused or] threatened serious harm, I believe that the state's argument for a maximum sentence of 15 years is appropriate on both counts.

MR. STANFA [Asst. State's Attorney]: Right of elocution [*sic*]. Prior to his sentence he has a right of elocution [*sic*].

THE COURT: You do have a right, Estaban, to address the Court if you wish to.

MR. MAHONEY [defense counsel]: Judge, he doesn't wish to address the court.

THE COURT: Thank you. As I've outlined all the reasons why and the decisions on this and looking at everything, I am going to impose the maximum sentence of fifteen years on each count to be served concurrent [*sic*]."

■ We conclude from this colloquy that the court was merely thinking out loud in its initial statement that 15 years on each count was an appropriate sentence. The court offered the defendant an opportunity to exercise his right of allocution before imposing the actual sentence, and the defendant declined. To now argue that this exchange amounted to a *denial* of the defendant's right to allocution is entirely meritless.

We will consider the defendant's next three contentions of error

together, since all relate to the factors in aggravation and mitigation the trial court considered and the sentence it imposed. The defendant argues that the trial court erred in considering the cause or threat of serious harm and in considering the potential deterrent effect to society.

This court has held that the imposition of a sentence is a matter within the trial court's discretion, and its decision will not be reversed on appeal absent an abuse of that discretion. (*People v. Black* (1992), 223 Ill. App. 3d 630, 633.) We have also found that the task of weighing factors in aggravation and mitigation is the function of the trial court. (*People v. Crosser* (1983), 117 Ill. App. 3d 24, 32.) Our supreme court has determined that the trial court's decision regarding sentencing is to be given great deference and weight. *People v. James* (1987), 118 Ill. 2d 214, 228.

■ The defendant first argues that the trial court improperly considered the cause or threat of serious harm as an aggravating factor, contending that serious harm is inherent in murder of any kind, and, absent evidence of particular brutality, it cannot be considered an aggravating factor. (See *Black*, 223 Ill. App. 3d at 634.) While we agree with the premise, we conclude from the record that the trial court considered this factor in assessing the totality of the defendant's actions, including the aggravated discharge of a firearm. The trial court noted in its oral review of the factors in mitigation and aggravation that the defendant shot a gun at fleeing subjects with the intent to kill them. The court could reasonably conclude that this aggravating factor was present even if no murder had been committed. The elements of this factor are not inherent in the offense of aggravated discharge of a firearm, because that crime requires only that the defendant fire at a person or a vehicle he knows to be occupied. (720 ILCS 5/24—1.2(2) (West 1992).) When, as here, the trier of fact has determined that the defendant intended to kill, the aggravating factor of threat of serious harm can be found. Consequently, the trial court's consideration of this factor was not an abuse of discretion.

■ The defendant also argues that the trial court erred in greatly considering the deterrent effect in determining the sentence. The defendant contends that the circumstances of this case were so unique as to make duplication in other instances highly unlikely. We find this argument meritless. Rather, we conclude that the trial court was correct in considering the possibility of deterring other victims of crime from responding with deadly force when their persons or dwellings are no longer under attack. We believe that this case is precisely the sort of situation in which the deterrent potential might have the

greatest effect in warning others not to repeat the mistakes made by the defendant—that firing a weapon at *fleeing* subjects is not lawful, irrespective of which party was the initial aggressor. Even if this were not the case, we would find consideration of the deterrence factor proper. In *Black,* we noted:

> "We agree with the fifth and first districts that the aggravating factor of deterrence may be used in sentencing for 'nondeterrable' crimes such as voluntary manslaughter and second-degree murder. Even supposed 'heat of passion' crimes need to be discouraged." *Black,* 223 Ill. App. 3d at 635.

■ Finally, the defendant contends that his sentence was excessive in light of the mitigating factors of youth and a lack of prior violent criminal acts. We find that the sentence was within the statutory sentencing guidelines and that the trial court properly considered the requisite factors in aggravation and mitigation. We find no abuse of discretion in the two 15-year concurrent sentences. As noted, self-defense and the defense of one's dwelling are acceptable; pure retribution is a criminal act. The trial court did not err in making that message clear.

For the foregoing reasons, the judgment of the trial court is affirmed.

Affirmed.

BOWMAN and DOYLE, JJ., concur.