THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. SENORINO RODRIGUEZ, Defendant-Appellant.

First District (1st Division)   No. 1—00—0622

Opinion filed November 27, 2002.—Rehearing denied January 21, 2003.

2

Frederick F. Cohn, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Kenneth T. McCurry, and Jon J. Walters, Assistant State's Attorneys, of counsel), for the People.

JUSTICE COHEN delivered the opinion of the court:

Defendant Senorino Rodriguez was charged in an eight-count indictment in the circuit court of Cook County with: (1) four counts of first degree murder alleging that defendant shot Julio Dominguez while committing the forcible felony of aggravated discharge of a firearm against both Gilberto Fernandez and Jorge Valentin Ayala (Valentin) (720 ILCS 5/9—1(a)(3) (West 1992)), defendant shot Julio with the intention of killing him (720 ILCS 5/9—1(a)(1) (West 1992)) and defendant shot Julio knowing such act created a strong probability of death or great bodily harm (720 ILCS 5/9—1(a)(2) (West 1992)); (2) two counts of aggravated discharge of a firearm alleging that defendant discharged a firearm in the direction of both Julio and Gilberto (720 ILCS 5/24—1.2(a)(2) (West 1996)); and (3) two counts of reckless discharge of a firearm alleging that defendant discharged a firearm in a reckless manner endangering the bodily safety of Julio and Gilberto (720 ILCS 5/24—1.5(a) (West 1996)). Following a bench trial, the trial court entered a general judgment finding defendant guilty of "all counts." Defendant was sentenced to consecutive prison

terms of 26 years for first degree murder, 4 years for aggravated discharge of a firearm and 3 years for reckless discharge of a firearm.

On appeal, defendant contends that the State failed to prove him guilty of first degree murder beyond a reasonable doubt. Alternatively, defendant argues that his first degree murder conviction should be reduced to second degree murder (720 ILCS 5/M9—2(a) (West 1998)) because the evidence demonstrates that defendant was either seriously provoked or had an unreasonable belief in the necessity of using deadly force in self-defense at the time of the shooting. Finally, defendant asserts that if we reduce his conviction to second degree murder, we must reverse his convictions for aggravated discharge of a firearm and reckless discharge of a firearm for lack of the requisite mental state. For the reasons set forth below, we affirm defendant's convictions for intentional murder, aggravated discharge of a firearm and reckless discharge of a firearm, vacate defendant's convictions and sentences for knowing and felony murder and remand the cause to the circuit court of Cook County solely for resentencing upon defendant's conviction for intentional murder.

## BACKGROUND

Evidence introduced at trial revealed that on October 12, 1996, Gilberto Fernandez, Julio Dominguez and Valentin Ayala lived in an apartment located at 1863 Green Lane in Palatine, Illinois. Gilberto and Julio were brothers and Valentin was their uncle. Defendant lived at 1956 Green Lane in the same apartment complex as Gilberto, Julio and Valentin. Defendant had known Gilberto and Valentin for approximately two years. Julio had only been in the United States for approximately six weeks.

Gilberto testified that late in the evening on October 12, 1996, he and Julio were returning home from Taco Bell when they encountered defendant and Valentin in the parking lot of their apartment complex. According to Gilberto, defendant told Gilberto to leave and threatened to "fuck [him] up." Gilberto testified that there was animosity between him and defendant based on an incident approximately four months prior, during which Gilberto and defendant had fought at a party and defendant had cut Gilberto's hand with a knife. Gilberto ignored defendant's threats and went inside to his apartment.

Gilberto and Julio continued to observe defendant and Valentin from the apartment. Gilberto testified that it appeared that Valentin and defendant were arguing. Gilberto and Julio returned to the parking lot to tell Valentin to "stop and go back inside." Gilberto and defendant then began arguing. While Gilberto and defendant were arguing, Julio went to move Gilberto's truck to a different parking

space. Gilberto testified that while Julio was walking away from defendant toward his truck, defendant drew a gun and shot Julio. Gilberto further testified that neither he, Julio nor Valentin was armed, nor had they threatened or struck defendant prior to the shooting.

The prosecutor showed Gilberto two photographs[1] depicting the parking lot where the shooting transpired. The photographs revealed a truck in the parking lot of the apartment complex; however, Gilberto testified that the truck in the photograph was not the truck that Julio intended to move at the time of the shooting. Gilberto indicated the locations in the photograph where defendant, Julio, Valentin and he were standing at the time of the shooting. The prosecutor then described for the record the location on the photograph where Gilberto was pointing. According to Gilberto, defendant was standing near the right front tire of the truck, Julio was at "a point slightly somewhere behind the truck," Gilberto was standing in an area "to the left of the margin just slightly off the photograph" and Valentin was "a little behind [Gilberto]." Gilberto further testified that he identified defendant from a photo array at the police station.

On cross-examination, defense counsel had Gilberto mark the photographs with the initials of defendant (SR) and Julio (JD2) to coincide with his testimony on direct examination as to their locations at the time of the shooting. Gilberto testified that Julio fell forward when he was shot. At defense counsel's request, Gilberto marked this location as "JD" on the photograph. Gilberto was unable to approximate the distance between defendant and Julio at the time of the shooting, but testified that defendant was positioned at the front end of the truck and Julio was positioned at the end of the truck. Gilberto further testified that a friend of defendant and Valentin's nephew were also present in the parking lot at the time of the shooting.

Valentin testified that in the late evening hours of October 12,

---

[1]As the distance between defendant and the victim at the time of the shooting was central to defendant's arguments on appeal and having noted that the impounded photographic exhibits of the crime scene were missing from the record, we ordered the parties to supplement the record with the impounded photographs. On October 1, 2002, the State's Attorney's office provided the affidavit of Laura Lane Ferguson, the executive clerk for court operations and administration in the office of the clerk of the circuit court of Cook County. In her affidavit, Ms. Ferguson averred that she conducted a thorough search and was unable to locate the impounded photographic exhibits. Because the photographic exhibits are missing through no fault of the parties and because upon careful review of the record we have determined that the photographs are not essential to our disposition of this appeal, we have chosen to proceed without the impounded photographic exhibits.

1996, he argued with defendant in the parking lot of the apartment complex about purchasing beer. According to Valentin, his nephew and a friend of defendant were also present. During the argument, Valentin observed Gilberto and Julio drive into the parking lot and walk toward their apartment. Valentin further testified that defendant threatened Gilberto, stating "get out of [here] because otherwise [I will] *** fuck [you] up." Gilberto ignored defendant and proceeded inside to his apartment. A few minutes later, Gilberto and Julio returned to the parking lot and told Valentin to go inside. An argument began between Gilberto and defendant. While Gilberto and defendant were arguing, Julio went to move Gilberto's truck to another parking space. According to Valentin, as Julio walked away, defendant shot him "from the front." Valentin testified that Julio fell to the ground and defendant fired two more shots. Valentin and Gilberto chased defendant briefly, but defendant was able to escape. Valentin then returned to Julio. Valentin observed blood coming from Julio's forehead. Valentin testified that he held Julio in his arms until the paramedics arrived. Valentin denied that either he, Gilberto or Julio was armed at the time of the shooting.

As with Gilberto, the prosecutor presented Valentin with two photographs depicting the scene of the shooting. Valentin pointed to locations in the photograph where defendant, Julio, Valentin and he were standing at the time of the shooting. The prosecutor then described for the record the location on the photograph where Valentin was pointing. According to Valentin, he was to the left side of the truck "outside the view of the photograph" and defendant was standing "near the right front tire" of the truck. At the prosecutor's direction, Valentin marked defendant's location in the photograph with the initials of defendant (SR). Valentin further testified that he was approximately 45 feet from Julio at the time of the shooting and that Gilberto was approximately 15 to 17 feet from Julio. Valentin testified that he had also identified defendant from a photo array at the police station. On cross-examination, Valentin admitted that Julio was "no closer than 10 to 12 feet" from defendant at the time of the shooting.

Detective Louis Sala of the Cook County sheriff's police department testified that at approximately 1:30 a.m. on October 12, 1996, he was notified of an incident occurring at the 1800 block of Green Lane in Palatine, Illinois. Upon arriving, Detective Sala observed a pool of blood and miscellaneous clothing adjacent to a pickup truck. Uniformed officers at the scene advised Detective Sala that there were two eyewitnesses to the shooting and a known offender. Detective Sala testified that he searched defendant's apartment and requested that defendant's "common law wife," Marissa Hertatto, be transported to the

Rolling Meadows police station for questioning. Detective Sala further testified that he went to Northwest Community Hospital to check on Julio's status. At that time, Julio was in critical condition; however, Detective Sala was later notified that Julio had died as a consequence of his injuries.

On October 13, 1996, an arrest warrant was issued for defendant. The following week, the police conducted periodic checks of defendant's residence and monitored defendant's place of employment. The police were unsuccessful in apprehending defendant until August 18, 1998, when a law enforcement official in Austin, Texas, notified the Cook County sheriff's police department that defendant was in their custody on a domestic battery charge. The following day, Detective Sala and Assistant State's Attorney Chris Kaczynski traveled to Texas to confirm defendant's identification and transport him to Illinois.

Tom Cebulski, an evidence technician for the Cook County sheriff's police department, testified that in the early morning hours of October 13, 1996, he was dispatched to a crime scene at the 1800 block of Green Lane in Palatine, Illinois. By the time Cebulski arrived, Julio had already been transported to Northwest Community Hospital. Cebulski testified that he recovered a baseball cap, a cassette tape, a bloodstained shirt and a pair of eyeglasses near a pool of blood adjacent to a "Ford F-250" truck. Cebulski also recovered three .25-caliber shell casings. Another bullet of the same caliber was recovered from Julio's body following an autopsy.

Investigator Sapp of the Cook County sheriff's police department testified that shortly after 1 a.m. on October 13, 1996, he and his partner, Investigator Kevin Rule, received a call of shots fired at 1853 Green Lane. Investigator Sapp immediately drove to that location, arriving approximately two minutes later. As Investigator Sapp approached the crime scene, he observed Valentin holding Julio in his arms. Investigator Sapp parked his police vehicle, exited and walked toward Valentin and Julio. Next to Valentin and Julio, Investigator Sapp observed a large pool of blood and called for an ambulance. Investigator Sapp conducted a search around the area where Julio was lying but did not observe any guns, knives, bottles or other possible weapons.

Dr. James Filkins, a deputy medical examiner at the Cook County medical examiner's office, performed an autopsy on Julio. An external examination revealed that Julio sustained a gunshot wound to the left temple, about 3½ inches from the top of his head. The bullet penetrated Julio's skull, damaged his brain, exited the back of his skull and lodged underneath his scalp. Dr. Filkins recovered the bullet from the back of Julio's head. Dr. Filkins testified that he observed the

presence of stippling (gun powder burns) measuring 3.2 inches by 1.2 inches around the entrance wound. Dr. Filkins further testified that the stippling indicated a close-range gunshot wound. Dr. Filkins estimated that the muzzle of the gun was "no closer than an inch away from *** [Julio]'s body and no further than two or perhaps two and a half feet from *** [Julio]'s body." Dr. Filkins concluded that Julio died of a close-range gunshot wound to the head and that the manner of death was homicide.

On cross-examination, Dr. Filkins testified that there would likely be no presence of stippling if the gun were positioned 3½ feet or more from Julio's body. Dr. Filkins also testified that it would be "virtually impossible" for the gun to cause stippling if it were positioned 10 feet from Julio's body.

On redirect, Dr. Filkins testified that he observed various abrasions of the left side of Julio's body and the injuries were consistent with Julio falling down. On re-cross-examination, however, Dr. Filkins admitted that he did not have an opinion as to how Julio fell.

Manuel Garcia, defendant's cousin, testified on behalf of defendant. Manuel testified that on October 13, 1996, he lived in an apartment located at 1902 Green Lane in Palatine, Illinois. Four months prior to the shooting, Manuel hosted a birthday party for another cousin at his apartment. Defendant attended the party. Manuel testified that Gilberto and two other individuals arrived at the party uninvited. They began drinking and one of the individuals spoke to defendant. According to Manuel, an argument began between defendant and the individual which eventually developed into a physical confrontation. Manuel testified that he observed Gilberto punch defendant in the face. He further testified that during the fight someone hurled a baseball bat. Manuel denied seeing anyone with a knife.

Manuel also testified to events that occurred on the day of the shooting. Manuel testified that on October 12, 1996, he and defendant spent most of the day repairing defendant's van. Around 4 p.m., defendant and Manuel stopped working on the van because defendant had to drive his wife somewhere. When defendant returned, he and Manuel put the tools away and went to Manuel's apartment. Manuel, defendant and 8 to 10 other individuals drank beer in Manuel's apartment. Around midnight, defendant and his friend Gabriel left Manuel's apartment to purchase more beer. Around 30 minutes later, Manuel heard gunshots and saw two individuals being chased. He identified Gabriel as one of those individuals.

On cross-examination, Manuel denied ever stating to Investigator Easton that defendant was the second individual being chased. Manuel did, however, admit that he never left his apartment to determine

whether defendant was involved in the shooting even though neither defendant nor Gabriel ever returned to his apartment that night. Manuel also admitted that he never went to defendant's apartment, located 50 feet away, to make sure that defendant was safe. Manuel further admitted that he did not offer any information to the police about what he had seen. Manuel also admitted that he also did not call the police when Gilberto and defendant fought at his party four months earlier. He also identified Valentin as one of the individuals chasing Gabriel and another person after the shooting. Manuel testified that he did not see defendant with a gun on the date of the shooting and he did not see a gun in the toolbox while he and defendant were fixing the van.

Elena Rodriguez, defendant's sister, testified that on October 13, 1996, she lived in an apartment adjacent to the parking lot where Julio was shot. She further testified that she observed Valentin and Gilberto on a daily basis and that they were "always drunk, always looking for problems, trouble." On cross-examination, Elena testified that on October 13, 1996, while in her apartment, she heard what sounded like firecrackers. She went to the window and observed a person lying on the ground and another person being chased. Elena then went outside. She admitted to having a conversation with Valentin but denied seeing defendant or his friend Gabriel.

Juan Estrada, defendant's friend, testified that around 12:30 a.m. on October 13, 1996, he was standing on the balcony of his apartment located at 1902 Green Lane when he overheard defendant talking to some people about buying beer. At that time, Valentin and Gilberto approached defendant and spoke with him. Approximately five minutes later, Juan observed Valentin, Gabriel and defendant get into a little red car and drive to a nearby alleyway. According to Juan, approximately 8 to 10 minutes later he heard "some banging sounds" that he thought were firecrackers. On cross-examination, Juan admitted that he never spoke to the police about what he had observed that evening.

Defendant testified on his own behalf. On October 13, 1996, defendant lived at 1956 Green Lane in Palatine, Illinois. He had known Valentin and Gilberto for approximately two years. According to defendant, Valentin and Gilberto frequently drank to excess and fought one another.

Defendant testified that four months prior to the shooting, he attended a birthday party hosted by his cousin Manuel. At some point during the party, defendant was talking with his brother-in-law near the front door of the apartment. While they were talking, and for no apparent reason, Gilberto grabbed defendant, hit him in the face three

times and ran outside. Defendant fell to the floor. Outside the apartment, Gilberto taunted defendant to come outside. According to defendant, Gilberto had a knife in his hand. At Manuel's request, defendant remained inside the apartment. After he left the party, defendant noticed that all four tires of his truck had been punctured with a knife.

The next morning, suspecting that Gilberto had punctured his tires, defendant went to Gilberto's apartment. Gilberto did not want to speak with defendant and refused to come outside. Approximately two weeks later, defendant saw Gilberto again, but Gilberto did not want to talk. Eight or nine days after that, around 1 a.m., defendant heard a knock on his apartment door. When defendant turned on the balcony light and looked outside, he saw Valentin, Gilberto and Julio. Defendant testified that he did not go outside nor did he speak to any of them.

On the afternoon of October 12, 1996, defendant testified that he was working on his truck with Manuel. Defendant's five-year-old son, Miguel, and two other individuals were also present. Defendant testified that he kept a .25-caliber gun locked in his toolbox. While he and Manuel were fixing his truck, defendant took the gun out of his toolbox and placed it in his right front pants pocket. Defendant testified that he placed the gun in his pocket because he did not want his son to have access to the gun.

Around 2:30 p.m., defendant testified that he drove his wife to the laundromat. He returned around 3 p.m. and continued to work on his truck until 7 p.m. At 7 p.m., defendant testified that he borrowed a car from one of the individuals who was helping him with his truck and drove to the laundromat to pick up his wife. Defendant dropped his wife off at home and then went to Manuel's apartment to return the car keys. Defendant testified that he stayed at Manuel's apartment for a while socializing and drinking beer. At some point they ran out of beer. There was a minor dispute over who was going to go to the liquor store to purchase more beer. Both Manuel and defendant had convictions for driving while under the influence of alcohol and did not want to drive. Eventually, defendant and a man defendant knew as "El Centavo" agreed to make the 10-minute walk to the liquor store. Defendant and El Centavo left Manuel's apartment around 12:30 a.m.

On his way to the liquor store, defendant testified that he encountered Valentin and a man named Juvenil Martinez, who were drinking and smoking. Valentin offered defendant a ride to the liquor store, but defendant declined. Defendant testified that Valentin insisted that he drive defendant to the liquor store, so defendant

acquiesced. Defendant got into the front seat of a small red car. Valentin then got into the front seat and El Centavo got into the backseat. After they were all in the car, defendant testified that Valentin accelerated the car quickly. Instead of driving toward the liquor store, Valentin drove into a parking lot next to a garbage bin. A group of people emerged from behind the garbage bin. Valentin then exited the car, slammed his door shut and walked toward the group of people. According to defendant, he heard Valentin tell the group of people that "Phila [defendant] is here."[2]

At that moment, Valentin and the group rushed toward the car. Defendant attempted to flee but was quickly surrounded. Three of the individuals began hitting defendant with "some stick or some piece of iron" and kicking defendant. Of the three individuals, defendant testified that he only recognized Gilberto. Defendant tried to fight back, but he was unable to stop them. According to defendant, the three individuals, including Gilberto, continued to beat him and threatened to kill him. Gilberto grabbed defendant by the chest and held him while the others punched defendant. Defendant was able to push Gilberto away, causing him to fall down. Gilberto then stood back up and now, even angrier, told defendant, "Now you're going to die."

Defendant testified that he then saw Gilberto take "something" out of his pocket and cut defendant's arm. Believing that his life was in danger, defendant reached into his right front pants pocket, pulled out his gun and fired several shots straight up into the air. Defendant testified that he specifically recalled firing two or three shots into the air because he was "so scared and panicky." He explained that his intention was "for them to let [him] go so they could hear the noise in the air, so they could let [him] go so [he] could run away from them." Gilberto and the other two individuals released defendant and defendant ran toward his apartment.

Defendant further testified that he did not go inside his apartment, but hid between nearby buildings. When defendant felt that it was safe, he walked to a gas station on Rand Road. At the gas station, defendant encountered a man and offered him $20 for a ride to Chicago. The man agreed and drove defendant to the house of defendant's relatives. Defendant stayed the night at this house. The following morning, defendant called his cousins in Texas. Defendant told his cousins that some people were trying to kill him. Defendant's cousins invited him to come to Texas, but advised defendant to first call the police. Defendant testified that he decided against calling the police because he thought it would make matters worse.

---

[2]Defendant testified that "Phila" was his nickname because he was originally from Philadelphia, Pennsylvania.

Another relative of defendant's was driving to Mexico the following day. Defendant rode with him to his cousins' home in Austin, Texas. Upon his arrival, defendant adopted the name Fernando Ramirez and began working at the same place as his brother. Defendant testified that he adopted the name Fernando Ramirez to keep "[his] enemies from following [him.]" Defendant remained in Texas for approximately two years, until he was apprehended and transported to Illinois. Defendant testified that he was not aware that anyone died as a result of the shooting until the police arrested him in Texas.

On cross-examination, defendant testified that from 1996 to 1998, he neither called nor wrote his "common law wife," relatives or friends in Illinois. Defendant admitted that he did not actually see Gilberto with a knife during the altercation in the parking lot. Rather, defendant testified that he "felt the punch, the poking. [He did not] know if it was a knife or what. But [he] felt it." Defendant further admitted that he did not see Valentin, Gilberto or the other individuals with a gun. When asked if anyone had a bat, piece of wood or anything hard, defendant responded that it "felt like they hit me with a metal stick or wooden stick."

After closing arguments, the trial court found defendant guilty of all counts and sentenced him to consecutive prison terms of 26 years for first degree murder, 4 years for aggravated discharge of a firearm and 3 years for reckless discharge of a firearm. In finding defendant guilty, the trial court stated that it considered the testimony of all the witnesses and the evidence presented at trial. The court expressly stated that it had considered at length the testimony of defendant and Dr. Filkins and determined that the State had met its burden of proof beyond a reasonable doubt. Defendant subsequently filed a motion for a new trial, which the trial court denied. This appeal followed.

## ANALYSIS

■ Prior to addressing the arguments defendant raises on appeal, we are compelled in the interest of justice to address the trial court's obvious error in convicting defendant of four separate counts of first degree murder. Although neither defendant nor the State has raised this issue in their briefs, we have the power to review the error *sua sponte* pursuant to Supreme Court Rule 366(a)(5). 155 Ill. 2d R. 366(a)(5). "Under Rule 366(a)(5), this court may, in the exercise of its responsibility to insure that a cause has a just result, ignore the doctrine of waiver and decide a case on grounds not properly raised or not raised at all by the parties." *People v. Feyrer*, 269 Ill. App. 3d 734, 739 (1994).

█ Our supreme court outlined the law with respect to the issue of multiple murder convictions in *People v. Cardona*, 158 Ill. 2d 403, 411-12 (1994), stating:

"Where but one person has been murdered, there can be but one conviction of murder; when multiple convictions are obtained for offenses arising out of a single act, sentence is imposed on the most serious offense. [Citation.] Under such circumstances only the conviction for the most serious charge of murder will be upheld, and the convictions on the less serious charges of murder are to be vacated. [Citations.] A killing that occurs when acts are performed with the intent to kill or to do great bodily harm involves a more culpable mental state than does either a killing that occurs when acts are performed with the knowledge that they create a strong probability of death or great bodily harm or a killing that occurs in the course of a felony. [Citation.] Where charges of intentional, knowing, and felony murder have been proved, intentional murder is deemed to be the most serious offense. [Citation.]"

█ Here, the trial judge issued a general judgment stating only that he found defendant guilty "on all counts." Consistent with this judgment, the commitment and sentencing order with respect to defendant's murder convictions states "Def. sentenced to 26 years IDOC on counts 1-2-3-4 concurrent." Counts I and II charged defendant with felony murder (720 ILCS 5/9—1(a)(3) (West 1992)), count III charged defendant with knowing murder (720 ILCS 5/9—1(a)(2) (West 1992)) and count IV charged defendant with intentional murder (720 ILCS 5/9—1(a)(1) (West 1992)). As defendant can only be convicted of the most serious charge of murder, *i.e.* intentional, we vacate defendant's convictions for knowing murder (count III) and felony murder (counts I and II). *Cardona*, 158 Ill. 2d at 413.

█ After a thorough review of the record, we recognize that additional issues could have been raised on appeal with respect to defendant's convictions for both aggravated and reckless discharge of a firearm, such as: (1) whether the State proved defendant guilty beyond a reasonable doubt of aggravated discharge of a firearm in that defendant discharged his gun "in the direction of" Gilberto; (2) whether defendant's convictions for aggravated and reckless discharge of a firearm arose from the same physical act as defendant's conviction for first degree murder, thus violating the "one-act, one-crime" rule; (3) whether the offense of reckless discharge of a firearm is a lesser included offense of aggravated discharge of a firearm; and (4) whether defendant's convictions for both aggravated and reckless discharge of a firearm are legally inconsistent.

Unlike the multiple murder conviction issue we raised *sua sponte*

above, the answers to these questions are not so obvious. While a reviewing court has the power to raise unbriefed issues pursuant to Supreme Court Rule 366(a)(5), we must refrain from doing so when it would have the effect of transforming this court's role from that of jurist to advocate. *Department of Public Aid ex rel. Peavy v. Peavy*, 307 Ill. App. 3d 16, 23-24 (1999). Were we to address these unbriefed issues, we would be forced to speculate as to the arguments that the parties might have presented had these issues been properly raised before this court. To engage in such speculation would only cause further injustice; thus, we refrain from addressing these issues *sua sponte*. See *In re Janssen*, 292 Ill. App. 3d 219, 228-29 (1997) (court declined to address an argument raised for the first time in the reply brief because to do so would have required the court to "speculate as to the nature of the arguments that could have been made, but were not").

We now address the arguments defendant raises on appeal.

### 1. Sufficiency of the Evidence

Defendant first argues that his conviction for first degree murder should be reversed because the evidence introduced at trial demonstrates that he acted in self-defense when he shot Julio. Specifically, defendant points to a conflict between Valentin's testimony that defendant shot Julio from a distance no closer than 10 to 12 feet, Gilberto's testimony that defendant shot Julio from a distance of about the length of a truck and the testimony of the State's deputy medical examiner, Dr. Filkins, that defendant shot Julio from a distance "no closer than an inch away from [Julio's] body and no further than two or perhaps two and a half feet from *** [Julio's] body." Defendant asserts that in light of his self-defense claim at trial and the fact that Dr. Filkins' testimony was consistent with his self-defense claim, Valentin's and Gilberto's testimony that no physical altercation occurred was "unbelievable" and therefore reasonable doubt of his guilt exists.

■ When a defendant challenges the sufficiency of the evidence, a criminal conviction will not be set aside unless the evidence is so improbable or unsatisfactory that it creates reasonable doubt of defendant's guilt. *People v. Hawkins*, 296 Ill. App. 3d 830, 837 (1998). It is not within the purview of the reviewing court to retry a defendant where the sufficiency of the evidence is at issue. *People v. Jimerson*, 127 Ill. 2d 12, 43-44 (1989). Rather, it is the responsibility of the trier of fact to determine the credibility of witnesses, the weight to be given to their testimony and the reasonable inferences to be drawn from the evidence. *People v. Brisbon*, 106 Ill. 2d 342, 360 (1985). The relevant question on review is whether, after considering the evidence in the

light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Schott*, 145 Ill. 2d 188, 203 (1991).

■ To establish self-defense, the defendant must show some evidence that: (1) unlawful force was threatened against him; (2) he believed the danger of harm was imminent; (3) he was not the aggressor; (4) the force used was necessary to avert the danger; and (5) his beliefs were reasonable. *People v. McGrath*, 193 Ill. App. 3d 12, 26 (1989). Once a defendant offers some evidence of self-defense, the burden is upon the State to prove beyond a reasonable doubt that the defendant did not act in self-defense. *People v. Boyd*, 307 Ill. App. 3d 991, 995 (1999). "While the law does not require the aggressor to be armed for self-defense to be justified, it must appear that the aggressor is capable of inflicting serious bodily harm without the use of a deadly weapon, and is intending to do so." *People v. Hawkins*, 296 Ill. App. 3d 830, 837 (1998).

■ "The reasonableness of an individual's belief that the use of deadly force was necessary depends on the surrounding facts and circumstances and is a question of fact." *People v. Hawkins*, 296 Ill. App. 3d at 836. The trier of fact is not obligated to accept a defendant's claim of self-defense; rather, in weighing the evidence, the trier of fact must consider the probability or improbability of the testimony, the circumstances surrounding the killing and the testimony of other witnesses. *People v. Baggett*, 115 Ill. App. 3d 924, 933 (1983).

■ We find defendant's argument—that the conflict in distance testimony mandates vacation of his conviction—to be illogical. Because defendant asserted the affirmative defense of self-defense at trial, he admitted to shooting and killing Julio, but he nonetheless claimed that he was not criminally responsible for his conduct. The conflicting testimony as to the distance between defendant and Julio at the time of the shooting, therefore, does not in and of itself create reasonable doubt of defendant's guilt of first degree murder. Whether defendant shot Julio from a distance of 10 to 12 feet or 2½ feet, defendant nevertheless admitted to shooting Julio. Based on defendant's admission, Dr. Filkins' testimony that the stippling present near the entrance wound indicated a close-range gunshot from a distance no closer than 1 inch and no farther than 2½ feet only served to corroborate defendant's claim of self-defense—not prove it. In finding defendant guilty, *inter alia*, of first degree murder, the trial court stated the following:

> "It's a difficult case. I have had an opportunity to view all the witnesses and view their testimony before me in court during the course of these proceedings. Interesting fact scenario. I have

listened to the defendant testify very, very closely, as I have the other witnesses. I have listened to Dr. Filkins' testimony and listened to that at great length.

Based upon the credibility of the witnesses that I viewed in court and based upon the totality of the entire range of evidence here that I have heard throughout the course of these proceedings, I feel the State has met their burden of proof beyond a reasonable doubt. I find the defendant guilty on all counts."

The trial court's statement clearly demonstrates that it found the State's witnesses more credible than defendant. On direct examination, in support of his self-defense claim, defendant testified that he was attacked by Gilberto and two other unknown individuals. He testified that not only did Gilberto threaten to kill him, but that he saw Gilberto take "something" out of his pocket and cut defendant's arm. According to defendant, because he believed that his life was in danger, defendant fired two or three warning shots into the air. On cross-examination, however, defendant admitted that he did not actually see Gilberto take "something" out of his pocket, but he stated "I felt the punch, the poking. I don't know if it was a knife or what. But I felt it." Moreover, defendant admitted that he did not see Valentin, Gilberto or the other individuals with a gun. When asked by the State if anyone had a bat, piece of wood or anything hard, defendant responded that it "felt like they hit me with a metal stick or wooden stick." Police testimony at trial established that no weapons were recovered from the crime scene.

We claim no independent insight into the events that transpired in the early morning hours of October 13, 1996. As a court of review, our analysis is constrained by the standard of review we must apply in sufficiency-of-the-evidence cases. We must defer to the trial court's credibility determination. After viewing the evidence in the light most favorable to the prosecution, we cannot conclude that the trial court erred in finding defendant guilty of first degree murder. *People v. Schott*, 145 Ill. 2d 188, 203 (1991).

Because there was little demonstrative evidence presented at trial, the crux of this case was witness credibility. The trial court, in stating that it considered all of the testimony, rejected defendant's claim that he did not intend to shoot Julio but, rather, in firing his gun into the air three times intended "for them [the assailants] to let [him] go so they could hear the noise in the air, so they could let [him] go so [he] could run away from them." We will not substitute our judgment for that of the trial court (*People v. Brisbon*, 106 Ill. 2d 342, 360 (1985) (it is the responsibility of the trier of fact to determine the credibility of witnesses, the weight to be given to their testimony and the reason-

able inferences to be drawn therefrom)), especially where, as here, defendant provided conflicting testimony concerning the physical altercation—the sole basis of his self-defense claim.

## 2. Second Degree Murder

Defendant alternatively argues that his first degree murder conviction should be reduced to second degree murder because the evidence demonstrates that defendant was either seriously provoked or had an unreasonable belief in the necessity of using deadly force in self-defense at the time of the shooting. The offense of second degree murder is defined in section 9—2(a) of the Criminal Code of 1961 in relevant part as follows:

"(a) A person commits the offense of second degree murder when he commits the offense of first degree murder as defined in paragraphs (1) or (2) of subsection (a) of Section 9—1 of this Code and either of the following mitigating factors are present:

(1) At the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by the individual killed or another whom the offender endeavors to kill ***; or

(2) At the time of the killing he believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this Code, but his belief is unreasonable." 720 ILCS 5/9—2(a) (West 1998).

■■ "Second-degree murder is a lesser mitigated offense of first-degree murder." *People v. Izquierdo-Flores*, 332 Ill. App. 3d 632, 637 (2002). The only difference between second degree murder and first degree murder is the "presence of a statutory mitigating factor such as serious provocation or an unreasonable belief in justification." *Izquierdo-Flores*, 332 Ill. App. 3d at 637. Second degree murder is also distinguishable from self-defense "only in terms of the nature of defendant's belief at the time of the killing." *People v. Hooker*, 249 Ill. App. 3d 394, 403 (1993). "If the defendant's belief as to the use of force was reasonable, self-defense may apply. If the defendant's belief was unreasonable, a conviction of second degree murder may be appropriate." *Hooker*, 249 Ill. App. 3d at 403.

"Supreme Court Rule 615(b)(3) empowers a reviewing court to reduce the degree of the offense of which a defendant was convicted. [Citation.] This power, however, should be used with extreme caution and only in rare instances. [Citation.]

The power to reduce the degree of the offense is available where a lesser-included offense is involved, where there is an evidentiary weakness with regard to an element of the offense charged, and where the trial judge has expressed dissatisfaction with imposing

the mandatory minimum sentence. [Citation.] Specifically, the power to reduce a conviction of first degree murder to second degree murder should be cautiously exercised." *Hooker*, 249 Ill. App. 3d at 403.

■■■ Once again, defendant places excessive importance on Dr. Filkins' testimony that Julio sustained a close-range gunshot wound. Defendant asserts that this testimony "demonstrates that there was an altercation between defendant and deceased, and others." As we stated above, however, Dr. Filkins' testimony served at best to corroborate defendant's self-defense claim—not prove it.

In addition to Dr. Filkins' testimony, defendant primarily relies upon his own testimony at trial to demonstrate that two of the mitigating factors were present at the time of the shooting, *i.e.*, mutual combat and unreasonable self-defense. The trial court, however, found the State's witnesses more credible than defendant; thus, we must assume that no physical altercation occurred. *People v. Brisbon*, 106 Ill. 2d 342, 360 (1985). With no physical altercation, defendant cannot demonstrate that either mitigating factor was present.

We find no evidentiary weakness in this case to suggest that we should reduce defendant's first degree murder conviction. Whether the trial court chose to believe defendant, the trial court properly could have found from the evidence adduced at trial that defendant was guilty of intentional first degree murder beyond a reasonable doubt. In choosing to believe the State's witnesses, the trial court properly found that defendant did not shoot Julio in order to protect himself; rather, defendant, carrying a gun in his front pants pocket, shot Julio during a verbal altercation with Gilberto and Valentin in the parking lot.[3] Moreover, even if the trial court had chosen to accept defendant's characterization of events, the court still properly could have found defendant guilty of first degree murder in that defendant, in firing three "warning shots" into the air, either knew or should have known that the natural and probable consequences of his actions would cause death or do great bodily harm. 720 ILCS 5/9—1(a)(2) (West 1998); see *People v. Greene*, 160 Ill. App. 3d 1089, 1098 (1987) ("It is not necessary to prove that the defendant had the intent to

---

[3]The fact that a verbal altercation occurred between defendant, Gilberto and Valentin also does nothing to support defendant's request that we reduce his conviction to second degree murder. Mere words and gestures "no matter how vile, can never constitute serious provocation such that second degree murder should be found instead of first degree murder." *People v. Garcia*, 165 Ill. 2d 409, 430 (1995). Moreover, "[t]hreats alone will not justify use of force in a killing, especially where the threats are made by someone other than the victim." *People v. Eason*, 326 Ill. App. 3d 197, 208 (2001).

commit murder, only that he voluntarily and wilfully committed an act, the natural consequences of which was to cause death or great bodily harm").

Furthermore, defendant does not contest his sentence and the record does not reveal any reluctance on the part of the trial court to impose a sentence within the mandatory minimum range. To the contrary, the trial court sentenced defendant to 26 years' imprisonment—a sentence above the minimum mandatory range for first degree murder. See 730 ILCS 5/5—8—1(a)(1)(a) (West 1998) (a term of imprisonment for first degree murder "shall be not less than 20 years and not more than 60 years"). Accordingly, we find that defendant's conviction for first degree murder should not be reduced.

### 3. Aggravated and Reckless Discharge of a Firearm

■■■ Finally, defendant does not argue the sufficiency of the evidence with respect to his convictions for aggravated and reckless discharge of a firearm. Rather, defendant contends only that, assuming *arguendo* that we either vacate his conviction for first degree murder or reduce that conviction to second degree murder, we must reverse his convictions for aggravated discharge of a firearm and reckless discharge of a firearm for lack of the requisite mental state. Because we affirm defendant's conviction for intentional first degree murder and decline defendant's invitation to reduce his sentence to second degree murder, we need not address this argument. We note, however, that even had we vacated defendant's conviction for first degree murder or reduced defendant's conviction to second degree murder, this finding would not have affected defendant's conviction for aggravated discharge of a firearm. As first degree murder, second degree murder and aggravated discharge of a firearm are specific intent crimes, they are legally consistent and may provide separate bases for conviction. *People v. Torres*, 269 Ill. App. 3d 339, 348-49 (1995); *People v. Tayborn*, 254 Ill. App. 3d 381, 391 (1993).

### 4. Murder Sentence

Because the trial court imposed sentences upon defendant's convictions of knowing and felony murder—convictions that we previously vacated—we must also vacate defendant's sentences for knowing and felony murder and remand for resentencing solely upon defendant's conviction for intentional murder. As our supreme court noted in *People v. Cardona*, 158 Ill. 2d 403, 414 (1994), the trial court's considerations in imposing sentence on a single conviction rather than multiple murder convictions might now be different.

### CONCLUSION

For the reasons stated above, defendant's convictions for inten-

tional murder, aggravated discharge of a firearm and reckless discharge of a firearm are affirmed. Defendant's convictions and sentences for knowing and felony murder are vacated and the cause is remanded to the circuit court of Cook County solely for resentencing upon defendant's conviction for intentional murder.

Affirmed in part and vacated in part; cause remanded.

GORDON, P.J., and McNULTY, J., concur.