NOTICE
Decision filed 12/03/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2024 IL App (5th) 230384-U

NO. 5-23-0384

IN THE

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Jefferson County. |
| | ) | |
| v. | ) | No. 21-CF-213 |
| | ) | |
| FREDERICK O. GOSS, | ) | Honorable |
| | ) | Jerry E. Crisel, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE BARBERIS delivered the judgment of the court.
Justices Moore and Sholar concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm defendant's convictions and sentences, where the trial court did not violate defendant's constitutional right to a fair and impartial jury, and defense counsel did not render ineffective assistance of counsel. We affirm defendant's convictions and sentences, where the court did not improperly rely on a factor inherent in the offenses or fail to adequately weigh defendant's potential for rehabilitation.

¶ 2    Following a jury trial in the circuit court of Jefferson County, defendant, Frederick O. Goss, was convicted of armed robbery (720 ILCS 5/18-2(a)(2) (West 2020)) and aggravated discharge of a firearm (*id.* § 24-1.2(a)(3)). The trial court sentenced defendant to concurrent terms of 40 years in prison for armed robbery to be served 50% with 18 months of mandatory supervised release (MSR) and 40 years in prison for aggravated discharge of a firearm to be served 85% with 3 years of MSR. Defendant appeals, arguing that the trial court denied his right to a fair and

1

impartial jury, defense counsel rendered ineffective assistance of counsel, and his sentences were excessive. For the following reasons, we affirm defendant's convictions and sentences.

¶ 3                                    I. Background

¶ 4      We limit our recitation to those facts relevant to our disposition of this appeal. We recite additional facts in the analysis section as necessary to address defendant's specific arguments.

¶ 5      On June 2, 2021, the State charged defendant by information with armed robbery (count I), a Class X felony, alleging that defendant, on or about June 2, 2021, armed with a firearm on or about his person, knowingly took property from the person or presence of the victim, Brian Jackson, by threatening the imminent use of force. The State also charged defendant with aggravated discharge of a firearm (count II), a Class X felony (*id.* § 24-1.2(a)(3)), alleging that defendant knowingly discharged a firearm in the direction of another person who the defendant knew to be a peace officer engaged in the execution of his official duties.

¶ 6      On October 15, 2021, defendant filed a motion to continue, asserting that he received multiple gunshot wounds to his person prior to his incarceration that resulted in defendant's confinement to a wheelchair. Defendant argued that the nursing staff at the Jefferson County jail reported defendant had a "critical" follow-up doctor's appointment "with respect to his rehabilitation" on October 26, 2021, for the examination of defendant's gunshot wounds. As such, defendant requested the court continue his trial until 2022. Four days later, the trial court held a final pretrial hearing and denied defendant's motion to continue.

¶ 7      On October 26, 2021, the trial court held defendant's jury trial, and the parties began *voir dire.* Following the lunch break, the judge stated on the record that "there's been an incident involving the Defendant here in the courthouse a few minutes ago." At the request of the court, the State provided an offer of proof informing that defendant disarmed Officer Jeff Clark while in

2

the sally port. After wrestling for Officer Clark's gun, defendant obtained the gun and pointed it at Officer Clark, who was positioned on the ground. At that time, Deputy David May ran down the stairs and shot defendant in the shoulder area. Following this incident, an ambulance transported defendant to the hospital. Defense counsel requested the court grant a mistrial. The court, noting that many of the jurors likely walked into the courthouse after the incident and viewed an ambulance and police cars, granted defense counsel's motion, without objection by the State.

¶ 8      On November 29, 2021, defense counsel filed a motion for a fitness examination of defendant asserting a *bona fide* doubt as to defendant's fitness to stand trial. Following a hearing on November 30, 2021, the trial court, over the State's objection, granted defense counsel's motion. The court appointed Dr. Angeline Stanislaus to evaluate defendant.

¶ 9      On February 22, 2022, Dr. Stanislaus filed her report with the trial court. In her report, Dr. Stanislaus found defendant fit to stand trial. Dr. Stanislaus noted that defendant's behaviors in the interview ran contradictory to his behaviors observed by jail staff. Dr. Stanislaus diagnosed defendant with "Other Specified Schizophrenia and Other Psychotic Disorder" but noted that defendant, in her opinion, had the capacity to understand his charges and the nature of the legal proceedings against him.

¶ 10      On July 14, 2022, the trial court held a hearing on defendant's fitness to stand trial. The State called Dr. Stanislaus to testify, and the court took judicial notice of her report following defendant's evaluation. Following the hearing, the court found defendant fit to stand trial.

¶ 11      On December 6, 2022, the trial court held defendant's three-day jury trial. During *voir dire*, the court informed the venire of the State's charges against defendant. The court informed the venire that they were not to consider the charges as evidence against defendant. The court stated that the State had the burden of proof and that a defendant was not required to prove his innocence,

present any evidence, or testify, and the jury could not draw any inference of guilt if the defendant chose not to testify. Next, the court asked the prospective jurors questions to determine their qualifications to serve as jurors. The court then divided the prospective jurors into three separate groups. The deputy clerk read the names of 14 prospective jurors, and the court asked the following principles of law required by Illinois Supreme Court Rule 431(b) (eff. July 1, 2012). First, the court asked the following: "Do you understand and accept the following principle, that the defendant is presumed innocent of the charges against him?" All 14 prospective jurors individually answered affirmatively. Next, the court asked: "Do you understand and accept the principle that before a defendant can be convicted, the State must prove the defendant guilty beyond a reasonable doubt?" All 14 prospective jurors individually answered affirmatively. The court then asked: "Do you understand and accept the principle that the defendant is not required to offer any evidence on his own behalf?" All 14 prospective jurors individually answered affirmatively. Finally, the court asked: "Do you understand and accept the principle that if the defendant elects not to testify, it cannot be held against him?" All 14 prospective jurors individually answered affirmatively. Lastly, all 14 prospective jurors individually answered affirmatively that they would apply the law as the court stated without regard to their own personal feelings. The court consistently asked the above questions with each individual in the next two groups. Following *voir dire*, the court empaneled a jury. The State and defense counsel accepted and denied individual prospective jurors in panels of four.

¶ 12     When individually questioning prospective jurors, defense counsel asked the second group of prospective jurors the following question:

> "MR. VAUGHN [(DEFENSE COUNSEL)]: If a person had been charged with a crime and chose not to testify in their own case, it would probable [*sic*] be because of blank.
> PROSPECTIVE JUROR KIMMEL: He didn't want to admit his truth that he was doing it.

4

* * *

MR. VAUGHN: If a defendant chose not to testify in his own case, it's probably because of blank.

* * *

PROSPECTIVE JUROR ELLIS: I would say because he feels he knows he's guilty and would not want to harm his case.

MR. VAUGHN: Okay. Just so the record in response to that last question, your Honor, the first juror, Pamela Kimmel, the head is going up and down in response to that questioning. And I'm going to interpret that to mean that you agree with that response. Is that fair to say, ma'am?

PROSPECTIVE JUROR KIMMEL: Yes.

MR. VAUGHN: Mr. Harris, I see your head going up and down to that last response from Brenda Ellis, so I am going to presume that you are agreeing with what she said.

PROSPECTIVE JUROR ELLIS:[1] I think he would believe he's guilty."

Defense counsel then asked the third group of prospective jurors the same question:

"MR. VAUGHN [(DEFENSE COUNSEL)]: * * * [I]f a person had been charged with a crime and chose not to testify in their own case, it would probably be because of blank.

PROSPECTIVE JUROR WITT: Advice from yourself or counsel.

***

PROSPECTIVE JUROR STROW: Exercise of right.

***

MR. VAUGHN: Neil Smith, same question.

PROSPECTIVE JUROR SMITH: I would say the stakes were high for him, and he probably just wanted to keep his mouth quiet.

MR. VAUGHN: Why would that be, sir?

PROSPECTIVE JUROR SMITH: Most likely guilty."

Defense counsel did not inquire further with prospective juror Smith but continued to ask the same question of the remaining prospective jurors. The following question and answer continued:

"PROSPECTIVE JUROR LIVESAY: Guilty would be what I would think.

PROSPECTIVE JUROR BURGIN: That's what I would think.

MR. VAUGHN: Same answer as Mr. Livesay?

PROSPECTIVE JUROR BURGIN: Like, you're an idiot. Don't open your mouth.

PROSPECTIVE JUROR ROBINSON: Same answer, sir.

PROSPECTIVE JUROR SCOVILLE: Most of the time it's on advice of their counsel whether they put them on the stand or not.

* * *

PROSPECTIVE JUROR DILDAY: Guilty or trying not to—or trying to keep his

---

[1]It appears that this should read PROSPECTIVE JUROR HARRIS, given that defense counsel immediately addressed Mr. Harris and not Ms. Ellis prior to this response.

mouth shut.

PROSPECTIVE JUROR CRUNK: Don't want to make things worse than they are.

\*\*\*

PROSPECTIVE JUROR BURK: Same answer.

\* \* \*

PROSPECTIVE JUROR MACEACHERN: I would say it would be on the advice of counsel.

\*\*\*

PROSPECTIVE JUROR CULLI: Same answer.

\*\*\*

PROSPECTIVE JUROR RAMSEY: That's what I would say."

¶ 13 Next, defense counsel asked the prospective jurors the following question: "[I]f you were on trial for a serious charge, how would you feel about having someone such as yourself on that jury?" After two prospective jurors answered, prospective juror Smith asked defense counsel to restate the question. Following defense counsel's restatement, prospective juror Smith responded: "I would feel okay about it." Outside the presence of the venire, the court held a "striking conference." The State accepted and tendered a panel consisting of prospective juror Smith. In response, defense counsel challenged prospective juror Smith for cause, and the following colloquy took place:

"MR. VAUGHN [(DEFENSE COUNSEL)]: \*\*\* I think when asked the question in my fill-in-the-blank question as to why a defendant would choose not to testify, I think his response was because he was guilty and he should keep his mouth shut. \*\*\*

THE COURT: Ms. Kozuszek [the State]?

MS. KOZUSZEK [(THE STATE)]: Your honor, I think he said the stakes \*\*\* are high, most likely guilty, and I don't think his opinion on an open-ended question that hasn't been asked if he could set it aside or not is enough to get a for-cause challenge.

Additionally, your Honor, I mean, that's the statement of half of the people we asked today. I don't know why his are any more subjective than anybody else's for an opinion question on whether or not—why the defendant would or wouldn't testify.

THE COURT: Do you have anything else to say on that, Mr. Vaughn?

MR. VAUGHN: No, your Honor.

THE COURT: Well, I think that \*\*\* it's too speculative. I don't think there is enough—he wasn't talking about—it wasn't asked with regard[ ] to this defendant specifically. It was a general question. I don't believe he made any statements that he believed this defendant was guilty, did he?

MS. KOZUSZEK: No, your Honor. In fact, he would say he would take himself as a juror.

6

THE COURT: He did say that. So I'm going to deny your motion to dismiss—to excuse [prospective juror Smith] for cause."

¶ 14    Following the trial court's decision, defense counsel stated the following:

"MR. VAUGHN: Your honor, I think I made the record as to Mr. Smith. I am out of peremptory challenges. I am not tendering that panel [of prospective jurors Ferrell, Bowman, and Smith] insofar as my objection to Mr. Smith would still be on the books.
THE COURT: All right. So the State had tendered the panel, had they not?
MS. KOZUSZEK: They had.
THE COURT: So we have Juror Number 9 is Tyler Horton. Number 10 is Janice Ferrell. Number 11 is Steven Bowman. And number 12 is Neil Smith."

¶ 15    Following *voir dire*, the following evidence was adduced at defendant's jury trial. The evidence demonstrated that Brian Jackson, a cashier at a Huck's convenience store, located at the corner of 10th Street and Veterans Memorial Drive in Mt. Vernon, Illinois, called 9-1-1 to report an armed robbery in the early morning hours of June 2, 2021. At approximately 2:40 a.m., video surveillance showed defendant, a black male wearing a black hoodie and blue face mask, point a silver revolver at Jackson demanding that Jackson hand over the cash in the register. Jackson complied and placed the cash from the register into a white Huck's grocery bag. Defendant took the white bag from Jackson and left the store. Jackson immediately called 9-1-1.

¶ 16    Shortly thereafter, Corporal Jagger Ellis responded to the 9-1-1 call. While canvassing the neighborhood area near Huck's, Corporal Ellis drove a marked squad car when he discovered defendant matching the description from the 9-1-1 call. Corporal Ellis exited his vehicle in uniform to attempt to make contact with defendant. Corporal Ellis requested defendant to stop and announced himself as "police." Defendant ignored Corporal Ellis's requests and a police pursuit by foot ensued. Corporal Ellis testified that defendant shot at him. Initially, Corporal Ellis's gun malfunctioned. He then cleared his gun. As defendant continued to shoot at him, Corporal Ellis returned fire on defendant. After employing an unsuccessful K9 unit to search for defendant, Corporal Ellis and other officers found defendant located in a mobile home with gunshot wounds

to his scrotum, inner thigh, and arm, as well as a broken leg. Officers also found a blue face mask and black hooded jacket in close proximity to defendant. In addition, as Corporal Ellis and other officers loaded defendant into an ambulance, officers located a $10 bill in the grass near the mobile home, as well as a white Huck's grocery bag that contained money. Moreover, crime scene investigators from the Illinois State Police recovered a silver revolver between the front deck and front door of the mobile home where police located defendant prior to his arrest. Following the close of evidence, the jury found defendant guilty on both counts.

¶ 17　On January 4, 2023, defendant filed a motion for a new trial and to vacate jury trial verdict. Relevant to this appeal, defendant claimed that the trial court erred by denying defendant's for-cause challenge on December 6, 2022, during *voir dire* as to prospective juror Neil Smith.

¶ 18　On February 9, 2023, the trial court held a hearing on defendant's motion for a new trial. Following argument, the court denied the motion. Next, the court held defendant's sentencing hearing. The State requested that "factors in aggravation of (1), (3), (7) and (12)" apply to defendant's case. Before addressing the factors in aggravation, the State asserted that defendant "could've been here [only] on an armed robbery" offense but instead he decided to escalate the situation and fire a gun at Corporal Ellis. The State asked the court to impose consecutive, permissive sentences to protect the public from further criminal conduct by defendant.

¶ 19　In addressing that defendant's conduct caused or threatened serious harm, the State argued that defendant shot a gun at a police officer in a neighborhood where children lived, stating: "In the dead of the night he's taken aim, not knowing where that gun is going to end up—or bullet is going to end up." Next, the State informed the trial court that defendant had been imprisoned for more than half of his life. Specifically, defendant admitted to being imprisoned for 30-plus years of his 56-year life, and the State noted that defendant "spent more time in prison than out of

8

prison." The State shared that defendant lived a life of criminality, starting at the age of 13, and violated parole on multiple occasions. The State highlighted that defendant's past criminal activity included burglary, multiple counts of theft, attempted robbery, armed robbery, and federal possession of a weapon by a felon. The State highlighted that defendant, while on supervised release for federal possession of a weapon by a felon, committed the instant crimes eight months after his release from federal prison. The State proceeded to state:

> "Your honor, he is a danger to the community. He is a danger to officers. He is a danger to himself. This man has been shot I think at least four times. Three on the night of the incident here. Then once again in the sally port when he is trying to escape, and I know the Court can give that whatever weight it wants, your Honor.
> We're in the middle of trial—[and this] *** man *** attempt[s] to disarm and escape from an officer in this very courthouse. So I don't know by what other action [defendant] could show this Court [that he] ha[s] no desire to comply with rules of society. [That he] ha[s] no desire to listen to whatever this Court says or imposes on me. I will do what I want, when I want, and how I want."

Next, the State requested that the court consider that defendant was on parole at the time he committed the instant offenses. As such, the State argued that permissive, consecutive sentences with 40 years on count I to be served at 50% and 45 years on count II to be served at 85% was necessary to deter others from committing offenses and shooting at officers.

¶ 20　In response, defense counsel requested the trial court not impose consecutive sentences on both counts. Defense counsel requested the court consider defendant's age and mitigation evidence that included a letter from defendant's brother as evidence of "another side to [defendant]." In requesting the imposition of a minimum term of incarceration with concurrent sentences of 6 years, plus the 15-year mandatory add-on, on count I and a 10-year sentence on count II, defense counsel highlighted that defendant maintained his actual innocence throughout trial.

¶ 21　Following statements by defendant's brother and defendant himself, the trial court sentenced defendant to concurrent terms of 40 years (25 years with a mandatory 15-year firearm

9

enhancement) in prison on count I to be served 50% with 18 months of MSR and 40 years in prison on count II to be served 85% with 3 years of MSR. In fashioning this sentence, the court detailed the following:

> "First off, I'll go into the factors in aggravation advocated by the State. Factor number (1), defendant's conduct caused or threatened serious harm. The Armed Robbery— well, certainly, the Aggravated Discharge of a Firearm, the jury found [defendant] guilty of that. *** I don't believe that—it didn't cause any harm, but it threatened serious harm, and I don't think that's an element of that charge, and so *** I think that is a factor that it certainly threatened serious harm. And one could also say that, I believe, as regards to Count I, Armed Robbery, because [defendant] had a gun, and that in and of itself threatens serious harm. So factor number (1) I find."

The court also considered that defendant had an extensive and lengthy criminal history, that a lengthy sentence was necessary to deter others from committing the same or similar crimes, and that defendant was on supervised release from federal prison during the commission of the instant crimes. The court highlighted that defense counsel did not present "any [specific] factors in mitigation," and defense counsel agreed. The court proceeded to state that mitigation evidence "might be (16), that the defendant suffers from serious mental illness, and I don't think we've got enough information to establish that," despite that Dr. Stanislaus "talk[ed] about schizophrenia." The court concluded that "no factors in mitigation *** apply." The trial court continued to state:

> "[T]he other thing I wanted to mention *** is that I give a lot of weight to [defendant's] criminal history in this matter. *** I don't give a lot of weight to the incident in the sally port that is currently the subject of charges to which I think we're having a preliminary hearing right after this hearing."

Following the sentence, the court stated that it was "saddened by what has happened in [defendant's] life." The court also noted that "robberies, and shootings, and people getting shot or shot at, *** it just shouldn't be happening, but this did happen. A jury of your peers agreed. They were out for 40 minutes with that decision."

10

¶ 22    On February 14, 2023, defendant filed a motion to reconsider sentence, arguing that the trial court erred at sentencing by (1) improperly applying favors in aggravation pursuant to section 5-5-3.2 of the Unified Code of Corrections (730 ILCS 5/5-5-3.2 (West 2020)); (2) failing to recognize defendant's potential for rehabilitation when imposing sentencing; and (3) imposing an excessive and unreasonable sentence in light of the evidence presented. Following a hearing on May 18, 2023, the trial court denied defendant's motion. Defendant filed a timely notice of appeal.

¶ 23                                  II. Analysis

¶ 24    On appeal, defendant argues that the trial court (1) abused its discretion by denying his challenge for cause of juror Smith and (2) committed second-prong plain error by seating jurors Pamela Kimmel, Brenda Ellis, and Kanen Dilday. Defendant also argues that defense counsel's failure to challenge jurors Kimmel, Ellis, and Dilday for cause amounted to first-prong plain error and ineffective assistance of counsel. Alternatively, defendant contends that the court erred by (1) imposing excessive sentences that improperly relied on an aggravating factor inherent in the offenses of armed robbery and aggravated discharge of a firearm and (2) failing to adequately weigh defendant's potential for rehabilitation. We address defendant's contentions in turn.

¶ 25    "A criminal defendant's right to trial by a fair and impartial jury is firmly rooted in our constitution." *People v. Stone*, 61 Ill. App. 3d 654, 666 (1978). "[T]he purpose of *voir dire* examination is to filter out prospective jurors who are unable or unwilling to be impartial." *People v. Washington*, 104 Ill. App. 3d 386, 390 (1982). Our supreme court has found that "a person is not competent to sit as a juror if his state of mind is such that with him as a member of the jury a party will not receive a fair and impartial trial." *People v. Cole*, 54 Ill. 2d 401, 413 (1973). A venireperson's state of mind must be ascertained from statements made by the venireperson, given the weight to which they are entitled under the circumstances. *People v. Leger*, 149 Ill. 2d 355,

11

385 (1992). "A challenge for cause is supported by a specific reason, like bias or prejudice, which disqualifies that potential juror; such challenges are limitless and left to the discretion of the trial court." *People v. Walls*, 2022 IL App (1st) 200167, ¶ 37. In reviewing a circuit court's ruling on a challenge for cause, the juror's *voir dire* examination must be considered in its entirety. *People v. Buss*, 187 Ill. 2d 144, 187 (1999) (citing *People v. Williams*, 173 Ill. 2d 48, 67 (1996)); see also *People v. Tenner*, 157 Ill. 2d 341, 363 (1993) (remarks of a prospective juror during *voir dire* must be considered "not in isolation but as a whole"); *People v. Peeples*, 155 Ill. 2d 422, 463 (1993) (reviewing court must consider the entire *voir dire* examination of a potential juror, as opposed to a selective response). While a prospective juror may be removed for cause when that person's "views would prevent or substantially impair the performance of his duties as a juror" (*People v. Armstrong*, 183 Ill. 2d 130, 143 (1998)), an equivocal response does not require that a juror be excused for cause (*Buss*, 187 Ill. 2d at 187 (citing *Williams*, 173 Ill. 2d at 67)).

¶ 26    The burden of showing that a venireperson possesses a disqualifying state of mind is on the party making the challenge. *Cole*, 54 Ill. 2d at 413. The determination of the juror's qualification must be made from the evidence; "[m]ere suspicion of bias is not evidence." *Id.* at 415. The determination of whether or not the venireperson has the state of mind which will enable him to give to an accused a fair and impartial trial rests in the sound discretion of the trial judge. *Id.* The court's determination should not be set aside unless it is against the manifest weight of the evidence. *Id.*

¶ 27    A complete review of juror Smith's *voir dire* examination shows that the trial could did not abuse its discretion by denying defense counsel's request to excuse juror Smith for cause. The record does not show that juror Smith formed an opinion or impression of defendant's guilt or innocence. In fact, juror Smith confirmed that he did not have an opinion as to defendant's guilt

or innocence before hearing any evidence. In addition, after the trial court properly admonished juror Smith of the principles set forth in Rule 431(b), juror Smith individually confirmed that he understood and accepted all of the principles, including that he could not hold it against defendant if defendant chose not to testify. Juror Smith then answered affirmatively on the record that he would follow the law, without regard to his own personal feelings on it, as it pertained to defendant's choice not to testify.

¶ 28    Contrary to defendant's argument, the record also reveals that juror Smith, unlike prospective jurors Chad Irvin,[2] Hank Mischke,[3] Ashley Beatty,[4] and Bobby Stagner,[5] stated on the record that he believed he had the ability to be fair and impartial towards defendant, even though his brother worked for the Department of Corrections. Prospective jurors Irvin, Mischke, Beatty, and Stagner, instead, all demonstrated their inability to be impartial by stating that they would find law enforcement more credible than other witnesses, had family members in law enforcement, or had close ties to officers involved in defendant's case. As such, unlike prospective jurors Irvin, Mischke, Beatty, and Stagner, juror Smith indicated that his relationship with law enforcement would not influence him as a juror and that he would not give the testimony of law enforcement greater weight than he would the testimony of other witnesses. Despite juror Smith's response to defense counsel's open-ended question as to why a defendant "would probably" not

---

[2]Chad Irvin stated that he would believe the testimony of law enforcement over an individual citizen or another witness.

[3]Hank Mischke stated that he would likely find law enforcement more credible than another witness, especially since he went to school and attended church with an officer involved with defendant's case.

[4]Ashley Beatty stated that she could not be fair and impartial because she knew Officer Ellis, and her brother-in-law worked for the Marion County Sheriff's Department. She stated on the record, "He [(defendant)] wouldn't want me on the jury."

[5]Bobby Stagner stated that the fact his relatives were police officers could affect his ability to be fair and impartial. He also responded to defense counsel's fill-in-the-blank question that a defendant probably chooses not to testify because "he knows he's guilty."

13

testify in their own case, we are unconvinced—after reviewing juror Smith's entire *voir dire* examination and not a single isolated statement—that juror Smith was biased as a matter of law. Accordingly, we cannot conclude the trial court's decision as to juror Smith's competency to serve as a juror was against the manifest weight of the evidence. Thus, we cannot conclude that the court abused its discretion by denying defense counsel's challenges to striking juror Smith for cause.

¶ 29 Next, defendant argues that the trial court's decision to seat jurors Kimmel, Ellis, and Dilday on defendant's jury constituted second-prong plain error. We first note that defendant admits that defense counsel failed to challenge this issue before the court. Accordingly, defendant forfeited this issue. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (a defendant forfeits review of an issue if he fails to object at trial and raise the issue in a posttrial motion). Defendant, however, argues in his opening brief that forfeiture should be excused under the second prong of the plain-error doctrine.

¶ 30 To obtain relief under the plain-error doctrine, "defendant must first show that a clear or obvious error occurred." *People v. Hillier*, 237 Ill. 2d 539, 545 (2010). In plain-error review, the burden of persuasion rests with the defendant. *People v. McLaurin*, 235 Ill. 2d 478, 495 (2009). Defendant does not argue plain error under the first prong, requiring a finding that the evidence is so closely balanced that the guilty verdict may have resulted from the error. See *People v. Piatkowski*, 225 Ill. 2d 551, 564-65 (2007). Rather, defendant contends that the court's failure to remove Kimmel, Ellis, and Dilday infringed on his right to an impartial jury, thus, affecting the fairness of his trial and challenging the integrity of the judicial process. *Id.* Defendant, therefore, contends that the error is reversible under the second prong of plain-error review.

¶ 31 Under the second prong of plain-error review, "[p]rejudice to the defendant is presumed because of the importance of the right involved, '*regardless* of the strength of the evidence.' "

14

(Emphasis in original.) *People v. Herron*, 215 Ill. 2d 167, 187 (2005) (quoting *People v. Blue*, 189 Ill. 2d 99, 138 (2000)). In *People v. Glasper*, our supreme court equated the second prong of plain-error review with structural error, asserting that "automatic reversal is only required where an error is deemed 'structural,' *i.e.*, a systematic error which serves to 'erode the integrity of the judicial process and undermine the fairness of the defendant's trial.' " 234 Ill. 2d 173, 197-98 (2009) (quoting *Herron*, 215 Ill. 2d at 186).

¶ 32    As our supreme court noted in *People v. Thompson*, "[a] finding that defendant was tried by a biased jury would certainly satisfy the second prong of plain-error review because it would affect his right to a fair trial and challenge the integrity of the judicial process." 238 Ill. 2d 598, 614 (2010). We, however, agree with the State that defendant essentially requests this court to hold that the trial court had a duty to strike potentially biased jurors *sua sponte* and that the failure to do so constituted plain error. We decline to impose a duty upon a trial court to *sua sponte* excuse a juror for cause in the absence of a defendant's challenge for cause or exercise of a peremptory challenge. *People v. Metcalfe*, 202 Ill. 2d 544, 555 (2002); see also *People v. Beasley*, 251 Ill. App. 3d 872, 884 (1993) (trial court should not dismiss potential jurors *sua sponte*); *People v. Bowman*, 325 Ill. App. 3d 411, 425 (2001) (appellate court rejected claims that trial court should have excused juror *sua sponte* in place of defense counsel's challenge of juror for cause or with a peremptory challenge to remove juror from jury). As our supreme court stated, "although a trial court certainly has the discretion to remove a juror *sua sponte* for cause [citation], a trial court does not have a duty to do so." *Metcalfe*, 202 Ill. 2d at 557. We note that we reviewed the case (*People v. Wilson*, 2022 IL App (5th) 190377, ¶¶ 30, 34) cited by defendant in support of the contrary result and do not find that case persuasive. Accordingly, the trial court did not commit plain error in

15

allowing jurors Kimmel, Ellis, and Dilday to sit on defendant's jury. Thus, defendant is not entitled to relief under the second prong of the plain-error doctrine.

¶ 33    Next, defendant admits that defense counsel failed to challenge for cause the presence of jurors Kimmel, Ellis, and Dilday on defendant's jury. Defendant has raised this issue, both as first-prong plain error and in the context of ineffective assistance of counsel. We find defendant's claims meritless.

¶ 34    Defendant is not entitled to relief under the first prong of the plain-error doctrine because the evidence in this case was not "so closely balanced that the jury's guilty verdict may have resulted from a clear or obvious error and not the evidence." *People v. Jackson*, 2022 IL 127256, ¶ 19. "To determine whether the evidence was, in fact, closely balanced, a reviewing court must review the entire record and conduct a 'qualitative, commonsense assessment' of any evidence regarding the elements of the charged offense or offenses, as well as any evidence regarding the witnesses' credibility." *People v. Williams*, 2022 IL 126918, ¶ 58 (quoting *People v. Sebby*, 2017 IL 119445, ¶ 53).

¶ 35    Here, a detailed review of the evidence demonstrates that it overwhelmingly established defendant's guilt beyond a reasonable doubt of armed robbery and aggravated discharge of a firearm. Notably, video surveillance showed defendant, a black male wearing a black hoodie and blue face mask, point a silver revolver at Jackson demanding that Jackson hand over the cash in the register at Huck's convenience store. Jackson complied and placed the cash from the register into a white Huck's grocery bag. Video surveillance further showed defendant take the white bag from Jackson and leave the store. Jackson immediately called 9-1-1 and law enforcement discovered defendant in close proximity to the Huck's store. Corporal Ellis testified that he attempted to make contact with defendant, but defendant refused to stop after Ellis announced

16

himself as "police." Defendant ignored Corporal Ellis's requests and a police pursuit by foot ensued. Corporal Ellis testified that defendant shot at him. As defendant continued to shoot, Corporal Ellis returned fire on defendant. After employing an unsuccessful K9 unit to search for defendant, Corporal Ellis and other officers found defendant located in a mobile home with gunshot wounds to his scrotum, inner thigh, and arm, as well as a broken leg. Officers also found a blue face mask and black hooded jacket in close proximity to defendant. In addition, as Corporal Ellis and other officers loaded defendant into an ambulance, officers located a $10 bill in the grass near the mobile home, as well as a white Huck's grocery bag that contained money. Moreover, crime scene investigators from the Illinois State Police recovered a silver revolver between the front deck and front door of the mobile home where police located defendant prior to his arrest. In our view, this evidence overwhelmingly established defendant's guilt and defendant has failed to show that the result of the proceeding would have been different had counsel challenged jurors Kimmel, Ellis, and Dilday.

¶ 36    Moreover, similar to juror Smith, jurors Kimmel, Ellis, and Dilday stated that they understood and accepted the principles set forth in Rule 431(b) and each affirmed that they would apply the law as stated by the court without regard to their own personal feelings. Consequently, we cannot say that the result of the proceedings would have been different if Kimmel, Ellis, and Dilday had not served as jurors at defendant's trial. Accordingly, the evidence of defendant's guilt was strong and not so closely balanced that the jury's verdict may have resulted from defense counsel's alleged error of not challenging for cause Kimmel, Ellis, and Dilday and not the evidence against defendant. Clearly, there is no reasonable probability that the jury would have acquitted defendant absent the alleged error. As such, defendant is not entitled to relief under the first prong of the plain-error doctrine.

¶ 37    Defendant also argues that defense counsel's failure amounted to ineffective assistance of counsel. "In order to succeed on a claim of ineffective assistance of counsel, a defendant must show (1) counsel's representation fell below an objective standard of reasonableness (deficiency prong) and (2) there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different (prejudice prong)." *People v. Boyd*, 2018 IL App (5th) 140556, ¶ 16 (citing *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984)). "Both prongs under *Strickland* must be satisfied in order to succeed on a claim of ineffective assistance, and the failure to satisfy either prong will be fatal to the claim." *Id.* ¶ 19 (citing *People v. Mack*, 2016 IL App (5th) 130294, ¶ 27). Our supreme court has ruled that the analysis under the plain-error doctrine is similar to the analysis for prejudice under a claim of ineffective assistance of counsel. *People v. White*, 2011 IL 109689, ¶¶ 133-34. Therefore, defendant's claim of ineffective assistance of counsel is meritless where, as here, he cannot show that he was prejudiced under the first prong of plain error.

¶ 38    Alternatively, defendant contends that the trial court sentenced him to an excessive sentence that erroneously relied on an aggravating factor inherent in the crimes of armed robbery and aggravated discharge of a firearm—"that [defendant's] conduct caused or threatened serious harm." We cannot agree. At the outset, the State argues that defendant forfeited this issue by failing to object before the trial court or raise the issue in a posttrial motion. The State also argues that, although defendant's claim could be reviewed for plain error, defendant failed to argue plain error in his opening brief. Defendant acknowledges in his reply brief that he did not properly preserve this issue. He, however, disagrees with the State that he has also forfeited plain-error review. In the absence of a plain-error argument by a defendant, we will generally honor a defendant's procedural default. *Hillier*, 237 Ill. 2d at 549. Although defendant did not argue second-prong plain

18

error in his opening brief for this sentencing issue, he argued plain error in his reply brief, which is sufficient to allow us to review the issue for plain error. See *People v. Ramsey*, 239 Ill. 2d 342, 412 (2010).

¶ 39    As stated above, under the second prong of plain-error review, "[p]rejudice to the defendant is presumed because of the importance of the right involved, '*regardless* of the strength of the evidence.' " (Emphasis in original.) *Herron*, 215 Ill. 2d at 187 (quoting *Blue*, 189 Ill. 2d at 138). In *Glasper*, 234 Ill. 2d at 197-98 (quoting *Herron*, 215 Ill. 2d at 186), our supreme court equated the second prong of plain-error review with structural error, asserting that "automatic reversal is only required where an error is deemed 'structural,' *i.e.*, a systematic error which serves to 'erode the integrity of the judicial process and undermine the fairness of the defendant's trial.' "

¶ 40    As a general rule, the consideration of a factor which is necessarily implicit in an offense cannot be used as an aggravating factor in sentencing. *People v. Conover*, 84 Ill. 2d 400, 404-05 (1981). Stated differently, a single factor cannot be used both as an element of an offense and as a basis for imposing a "harsher sentence than might otherwise have been imposed." *People v. Gonzalez*, 151 Ill. 2d 79, 83-84 (1992). Such dual use of a single factor is often referred to as a " 'double enhancement.' " *Id.* at 84. A sentence imposed by a trial court, however, will not be reversed unless it is clearly evident that the sentence was improperly imposed. *People v. Ward*, 113 Ill. 2d 516, 526 (1986). A defendant bears the burden of establishing that a sentence was based on improper considerations. *People v. Dowding*, 388 Ill. App. 3d 936, 943 (2009).

¶ 41    The trial court stated the following with regard to the first factor in aggravation concerning the offenses of aggravated discharge of a firearm and armed robbery:

> "First off, I'll go into the factors in aggravation advocated by the State. Factor number (1), defendant's conduct caused or threatened serious harm. The Armed Robbery— well, certainly, the Aggravated Discharge of a Firearm, the jury found [defendant] guilty of that. *** I don't believe that—it didn't cause any harm, but it threatened serious harm,

19

and I don't think that's an element of that charge, and so \*\*\* I think that is a factor that it certainly threatened serious harm. And one could also say that, I believe, as regards to Count I, Armed Robbery, because [defendant] had a gun, and that in and of itself threatens serious harm. So factor number (1) I find."

A person commits the offense of armed robbery when he "takes property \*\*\* from the person or presence of another by the use of force or by threatening the imminent use of force" (720 ILCS 5/18-1(a) (West 2020)) while "armed with a firearm" (*id.* § 18-2(a)(2)). Thus, it is implicit that the offense was committed while armed with a firearm. However, the threat of serious harm is not implicit in every armed robbery. See *People v. Davis*, 252 Ill. App. 3d 812, 814 (1993). Moreover, with regard to the offense of aggravated discharge of a firearm, which "requires only that the defendant fire at a person or a vehicle he knows to be occupied" (*People v. Torres*, 269 Ill. App. 3d 339, 350 (1995); 720 ILCS 5/24-1.2(a)(2) (West 2020)), "not every aggravated discharge of a firearm threatens the same amount of harm." *People v. Ellis*, 401 Ill. App. 3d 727, 731 (2010).

¶ 42 Following a review of the record in the instant case, we cannot find that the trial court erred by considering that defendant's use of a gun threatened serious harm as an aggravating factor in sentencing him for the offenses of armed robbery and aggravated discharge of a firearm. Our supreme court has cautioned courts not to rigidly apply the general rule that a sentencing court should not consider an aggravating factor inherent in the offense. *People v. Saldivar*, 113 Ill. 2d 256, 269 (1986) ("The legislature clearly and unequivocally intended that [a] varying quantum of harm may constitute an aggravating factor."). Rather, it has been held that the degree of threatened harm in an armed robbery is a proper sentencing consideration. *People v. Gray*, 212 Ill. App. 3d 613, 617 (1991) (defendant used shotgun during robbery); *People v. Griffin*, 117 Ill. App. 3d 177, 185 (1983) (a defendant pointed fully loaded revolver at the victim while demanding money, while a codefendant grabbed the victim by the arm and demanded more money). Additionally, because the threat of serious harm is not an inherent element of the offense of aggravated discharge of a

20

firearm, the degree of serious harm can be considered by a court in fashioning a sentence. *Ellis*, 401 Ill. App. 3d at 731.

¶ 43    With this in mind, a review of the evidence demonstrates that defendant's conduct threatened serious harm to Jackson, Corporal Ellis, and himself to a degree sufficient to allow the sentencing judge to consider defendant's conduct as an aggravating factor for both offenses. Specifically, defendant pointed a gun directly at Jackson and demanded Jackson give him the cash in the register. Shortly thereafter, defendant, again, pointed a gun at Corporal Ellis and then fired multiple rounds at him after Corporal Ellis announced himself as a police officer and instructed defendant to stop running. Importantly, as the State points out, defendant, while running from police, fired his gun at Corporal Ellis in the dark in a neighborhood with no sense of where he was firing. In the instant case, we agree with our colleagues in the Fourth District that "[a]nything and everything beyond the minimum conduct necessary for the defendant to be found to have engaged in criminal behavior is entirely appropriate for a sentencing court to consider." *People v. Hibbler*, 2019 IL App (4th) 160897, ¶ 71. As such, based on the facts of this case, defendant's actions clearly created a threat of serious harm much greater than the minimal threat necessary to simply commit the bare offenses of armed robbery (see *Davis*, 252 Ill. App. 3d at 814-15 (court explained that a defendant may commit armed robbery by briefly showing a gun, whereas the defendant's actions of jumping over a store counter and pointing a gun at a clerk constituted a greater threat of serious harm than the former)) and aggravated discharge of a firearm (see *Ellis*, 401 Ill. App. 3d at 731 ("Compare the 'warning shot' that is intended to go and does go six feet over someone's head to a shot that sends a bullet flying within an inch of someone's ear.")). As such, we cannot conclude that the court erred by considering the nature and circumstances of defendant's actions in determining that such actions posed a serious threat of harm to himself and others.

¶ 44 Furthermore, we also note that the trial court specified on the record that it took defendant's extensive criminal history into consideration when fashioning defendant's sentence, stating:

> "[T]he other thing I wanted to mention *** is that I give a lot of weight to [defendant's] criminal history in this matter. I don't give a lot of weight to the incident in the sally port that is currently the subject of charges to which I think we're having a preliminary hearing right after this hearing."

In addition, the court also considered that a lengthy sentence was necessary to deters other from committing the same or similar crimes, and that defendant was on supervised release from federal prison for federal possession of a weapon by a felon during the commission of the crimes at issue. As such, we conclude that the length of defendant's sentences was not increased based on the court's reference to defendant's conduct of using a gun during the commission of the instance offenses. See *People v. Bourke*, 96 Ill. 2d 327, 332 (1983) ("[W]here it can be determined from the record that the weight placed on the improperly considered aggravating factor was so insignificant that it did not lead to a greater sentence, remandment is not required.").

¶ 45 Accordingly, we conclude that the trial court did not err by considering the degree to which defendant's conduct threatened serious harm as an aggravating factor when sentencing defendant to the offenses of armed robbery and aggravated discharge of a firearm. Based on the foregoing, defendant is not entitled to relief under the second prong of the plain-error doctrine.

¶ 46 Lastly, defendant argues that the trial court failed to adequately balance the severity of the offenses against defendant's potential for rehabilitation as an objective of the sentence. Specifically, defendant argues that the court failed to consider defendant's age, his physical and mental health issues, his recent history of employment, and his family support when devising a sentence " 'with the objective of restoring the offender to useful citizenship.' " We cannot agree.

¶ 47 The trial court has broad discretionary powers to impose a sentence, and the court's sentencing decision is entitled to great deference. *People v. Stacey*, 193 Ill. 2d 203, 209 (2000).

22

The trial court is granted such deference because the trial court is generally in a better position than the reviewing court to determine the appropriate sentence. *Id.* The trial court "has the opportunity to weigh such factors as the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age." *Id.* (citing *People v. Streit*, 142 Ill. 2d 13, 19 (1991); *People v. Perruquet*, 68 Ill. 2d 149, 154 (1977)). The rehabilitative potential of a defendant is only one of the factors that needs to be weighed in deciding a sentence, and the trial court does not need to expressly outline its reasoning for sentencing or explicitly find that the defendant lacks rehabilitative potential. *People v. Evans*, 373 Ill. App. 3d 948, 968 (2007). The court is required to consider both the seriousness of the offense and the defendant's potential for rehabilitation. *People v. Weiser*, 2013 IL App (5th) 120055, ¶ 32. "However, the court is not required to give more weight to the defendant's potential for rehabilitation than it gives to aggravating factors, such as the seriousness of the offense." *Id.* In fact, "[t]he seriousness of the offense is one of the most important factors for the court to consider." *Id.* " '[T]he nature and circumstances of the offense and the history and character of the defendant will be the governing factors' of rehabilitative potential." *People v. Flores*, 404 Ill. App. 3d 155, 159 (2010) (quoting *People v. Gibbs*, 49 Ill. App. 3d 644, 649 (1977)).

¶ 48     Accordingly, this court "must not substitute its judgment for that of the trial court merely because it would have weighed these factors differently." *Stacey*, 193 Ill. 2d at 209 (citing *Streit*, 142 Ill. 2d at 19). Where, as here, an imposed "sentence falls within the statutory limits, it will not be overturned on appeal absent an abuse of discretion." *People v. Bunning*, 2018 IL App (5th) 150114, ¶ 16. "An abuse of discretion occurs only if a sentence greatly varies from the spirit and purpose of the law or where it is manifestly disproportionate to the nature of the offense." *Id.*

23

¶ 49    In applying these principles to the present case, we cannot say that the trial court abused its discretion by sentencing defendant to 40 years in prison on each count—a sentence well within the sentencing range of 6 to 30 years, plus a 15-year mandatory firearm enhancement on the offense of armed robbery, and 10 to 45 years on the offense of aggravated discharge of a firearm. Contrary to defendant's argument, we cannot conclude that defendant's sentence "fell outside the bounds of reason," given the seriousness of the offenses at issue, defendant's extensive and lengthy criminal history that spanned the majority of his life, and that defendant was on supervised release from federal prison during the commission of the instant crimes. As such, despite defendant's argument, a variety of factors indicated poor rehabilitative potential. Accordingly, we cannot say that defendant's sentence fails to reflect his rehabilitative potential.

¶ 50    Moreover, the record reveals that the trial court reviewed all evidence presented, all factors in aggravation, the presentence investigation report, the seriousness of defendant's offense, and all arguments by the parties before imposing defendant's sentence. The court also heard limited mitigation evidence[6] that included oral and written statements by defendant's brother, as well as Dr. Stanislaus's report that detailed defendant's mental health issues. As stated above, the court "[was] not required to give more weight to the defendant's potential for rehabilitation than it gives to aggravating factors, such as the seriousness of the offense." *Weiser*, 2013 IL App (5th) 120055, ¶ 32. Accordingly, we cannot conclude that the court abused its discretion when sentencing defendant.

¶ 51                                III. Conclusion

¶ 52    For the reasons stated, we affirm defendant's convictions and sentences for armed robbery and aggravated discharge of a firearm.

---

[6]The report of proceedings reveals that defense counsel did not advocate for "any [specific] factors in mitigation."

24

¶ 53    Affirmed.